T.C. Summary Opinion 2007-3


UNITED STATES TAX COURT


GERRY M. GRIGGS, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 839-04S.                    Filed January 3, 2007.


Gerry M. Griggs, pro se.

Portia N. Rose, for respondent.


COUVILLION, Special Trial Judge: This case was heard

pursuant to section 7463 in effect when the petition was filed.[1]

The decision to be entered is not reviewable by any other court,

and this opinion should not be cited as authority.

---

[1]Unless otherwise indicated, subsequent section references
are to the Internal Revenue Code in effect for the year at issue,
and all Rule references are to the Tax Court Rules of Practice
and Procedure.

Respondent determined a deficiency of $23,709 in petitioner's Federal income tax for the year 2000, an addition to tax under section 6651(a)(1) in the amount of $5,334.53, an addition to tax under section 6651(a)(2), and an addition to tax under section 6654 in the amount of $1,275.16. In the answer, respondent conceded the section 6651(a)(2) addition to tax and, pursuant to section 6214(a), claimed an increase in the section 6651(a)(1) addition to tax of $592.72. In a trial memorandum, respondent conceded the section 6654 addition to tax.[2]

The issues for decision are: (1) Whether petitioner is entitled to claim a deduction for miscellaneous legal expenses on Schedule A, Itemized Deductions, in an amount exceeding what was allowed by respondent; (2) whether petitioner is entitled to claim deductions for various trade or business expenses disallowed by respondent for two business activities of petitioner reported on separate Schedules C, Profit or Loss From

_____

[2] At the time the notice of deficiency was issued, petitioner had not filed his Federal income tax return for the year at issue. The notice of deficiency is based upon information returns filed by third-party payers for nonemployee compensation, wages, and interest paid to petitioner. Petitioner does not challenge these determinations. After the notice of deficiency was issued, as stated in respondent's brief, "petitioner provided respondent with his individual income tax return for the 2000 taxable year." Respondent further stated on brief: "Petitioner has never provided an explanation as to why his return was filed late." That statement appears to indicate that petitioner's return was processed as a filed return. Petitioner does not challenge the income determinations in the notice of deficiency, and the issues essentially involve two trade or business activities and itemized deductions.

Business; (3) whether petitioner is entitled to a Schedule A deduction for the writeoff of unsold inventory that belonged to a discontinued trade or business activity; and (4) whether petitioner is liable for the section 6651(a)(1) addition to tax.

Some of the facts were stipulated, and those facts are so found. At the time the petition was filed, petitioner was a legal resident of Houston, Texas.[3]

Although petitioner was an employee during the year at issue, the principal issues in this case arise from two self-employed trade or business activities petitioner was engaged in that year. Petitioner claimed losses from both of these activities that respondent challenges.

Petitioner has an M.B.A. degree from Harvard University and is a certified public accountant. Since 1983, he has been involved in various business ventures as an investment and

---

[3] Sec. 7491(a) shifts the burden of proof to the Commissioner with regard to any factual issue relevant to ascertaining the taxpayer's liability. Sec. 7491(a)(2) limits application of this rule to an issue or issues for which the taxpayer has complied with the requirements for substantiation of any item, has maintained all records with respect to such items, and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, and interviews, etc., regarding matters at issue. In this case, the burden of proof does not shift to respondent because petitioner's failure to cooperate with respondent's counsel in submitting records as to the matters at issue resulted in the issuance of an order by the Court on Oct. 6, 2004, ordering the parties to stipulate and exchange documents with each other to enable this case to proceed to trial. As to the additions to tax, the burden of production is on respondent. Sec. 7491(c).

merchant banker.  In 1985, petitioner was employed by Advanced Energy Technologies (AET) as vice president and chief financial officer (CFO).  He was also on the board of directors of AET until January 1989.  AET terminated petitioner from his position as CFO in September 1988.  In May 1989, petitioner returned to AET as CFO and was again terminated in January 1990.

The first issue is petitioner's claim to Schedule A deductions of $11,981.54 for miscellaneous legal expenses. Petitioner paid legal fees in connection with litigation against his former employer, AET, for breach of his employment contract and for the recovery of retirement benefits.  Petitioner also paid legal fees in connection with litigation against two other corporations over the purchase of certain film rights and assets. Another legal action involved a malpractice claim against one of his former attorneys.

Of the $11,981.54 claimed by petitioner for miscellaneous legal expenses on Schedule A of his return, respondent concedes petitioner's entitlement to a deduction of $5,000 for legal expenses, leaving at issue $6,981.54.

Based on the evidence presented at trial, the Court is satisfied that petitioner is entitled to an additional deduction of $5,501.86 for legal expenses.  This consists of $3,000, which is shown as a credit on a statement presented at trial from one of the law firms that represented petitioner, and $2,501.86,

represented by three checks payable to one of the other law firms that represented petitioner. Therefore, of the $11,981.54 claimed by petitioner as miscellaneous legal expenses on his return, petitioner is entitled to a deduction of the $5,000 conceded by respondent and $5,501.86 based on the evidence presented at trial. This leaves a balance of $1,479.68, which the Court finds has not been substantiated and, therefore, holds is not allowable as a deduction.

As stated earlier, the income tax return submitted by petitioner at trial included two Schedules C with respect to trade or business activities engaged in by petitioner. One of these activities was described as "Media Content and Entertainment and Songs" with a business name of "Kirshner Content and related entities".[4] The Schedule C reported gross income of zero and various expenses. The activity was described at trial as an activity of petitioner and another individual, Robert Thurmond (Thurmond), as partners. Petitioner and Thurmond referred to their affiliated activity as the Equisource Group.[5]

---

[4] Petitioner's other Schedule C involves an activity called "Frexie". Respondent made adjustments to that activity, and those adjustments are addressed later in this opinion.

[5] Since Kirshner Content was represented to be an activity of petitioner and Thurmond, the Court assumes that the numbers on the Schedule C represent petitioner's allocable portion of the expenses.

Sometime in 1993, petitioner and Thurmond were approached by Don Kirshner (Kirshner), a noted song publisher, entertainment promoter, and agent, to exploit rights Kirshner had to various entertainment assets. Kirshner had been the host and creator of a weekly rock concert program on national television called "Don Kirshner's Rock Concert" (Rock Concert) from 1972 to 1983 and possessed rights to about 185 to 200 hours of programming from the Rock Concert as well as "Don Kirshner's Comedy Hour" that had never been rebroadcast or licensed.

Petitioner, Thurmond, and Kirshner agreed to establish business entities that would obtain a license from Kirshner to exploit rights to "Don Kirshner's Rock Concert", the name "Don Kirshner", and his likeness, together with extensive entertainment memorabilia. These tangible and intangible properties were collectively known as the Kirshner properties.

Beginning with the license from Kirshner for the Kirshner properties as a base, the various Kirshner entities were also envisioned as a base for acquiring, managing, producing, and distributing entertainment software in various forms.[6]

On or about May 12, 1995, Kirshner and the Equisource Group (petitioner and Thurmond) signed a venture agreement to form

_____

[6] According to petitioner, the various Kirshner entities were known collectively as "Kirshner Content", which is not to be confused with the Don Kirshner Content, Inc., one of the entities. See infra.

Kirshner Global, Inc. (Kirshner Global). Kirshner and Equisource were listed as "Founding Partners". Under the terms of the venture agreement, Equisource was to obtain interim financing of $1 million within a 60-day period or Kirshner would have the option of terminating the agreement. Similar terms were also provided for permanent financing within a 120-day period. The interim financing proceeds would have been used, in part, to pay the "Founding Partners" for out-of-pocket expenses incurred on Kirshner Global's behalf prior to the interim financing.[7]

Under the venture agreement, the execution of other documentation within a 15-day period subject to interim financing was also required. The documents included an employment agreement, a stockholders' agreement, an Equisource financial advisory agreement, a licensing agreement, and a subscription agreement. Once this was accomplished and Kirshner Global was formed, petitioner and Thurmond would be named as directors on Kirshner Global's board of directors.

On or about February 21, 1996, the Don Kirshner Content Co., Inc. (Kirshner Content) was formed with the specific intention of acquiring the Rock Concert license from Kirshner and maintaining an aggressive plan of strategic acquisitions of other entertainment assets. As the managing director of the Equisource

---

[7] As noted, petitioner and Thurmond would be entitled to reimbursement as "Founding Partners", only through Equisource.

Group, petitioner was listed as a member of the support team responsible for organizing and obtaining financing for Kirshner Content.

On or about February 22, 1996, State Street Capital Markets Corp. offered a confidential private placement memorandum for the purpose of raising capital for Kirshner Content. Investors would invest a maximum of $1.5 million for 30 units, which would be convertible into a promissory note, common stock, and common stock purchase warrants in Kirshner Content. Petitioner was listed as the executive vice president, chief financial officer, treasurer, and director of Kirshner Content.

On or about April 17, 1996, in connection with an attempt to obtain interim financing, Kirshner Content issued a promissory note in the amount of $279,440 to C&C Partners, LLC, a New York limited liability company,[8] which petitioner and Thurmond personally guaranteed. Petitioner and Thurmond's guaranties were subject to four separate conditions. Another guaranty was made on April 24, 1996, by Martin Licht, secretary and counsel for Kirshner Content.[9] Under the terms of the promissory note, it

---

[8] The record sometimes refers to "C&C Investments" in connection with the promissory note. For this purpose, C&C Investments and C&C Partners, LLC, are treated as one and the same.

[9] Although not specified in the record, Licht apparently was a business associate of Kirshner.

was payable together with interest no later than June 17, 1996. Kirshner Content defaulted on the promissory note.[10]

In a confidential business plan dated July 1996, Kirshner Content proposed the issuance of stock in a public offering for at least $25 million. As the managing director of Equisource, petitioner was named as a member of the support team participating in the organization and financing of Kirshner Content.

On or about March 7, 1997, C&C Partners filed suit in Texas against petitioner and Thurmond for payment of the $279,440 promissory note due to Kirshner Content's default. Petitioner and Thurmond retained the law firm Baker & Botts, L.L.P., in Houston to represent them in the ensuing litigation.[11]

As previously stated on the Schedule C that petitioner submitted with respect to Kirshner Content, petitioner reported zero gross income for the activity and claimed deductions for various expenses related to the activity: (1) A bad debt in the amount of $7,118; (2) legal and professional fees in the amount

---

[10] On or about Sept. 18, 1996, C&C Partners, LLC, filed suit in New York State court against petitioner, Thurmond, and Licht, the three guarantors, and, a month later, the case was removed to Federal District Court. With respect to petitioner and Thurmond, the case was removed to Texas. The case against Licht in New York continued. In that court proceeding, judgment was entered in favor of C&C Partners, LLC, in November 1997.

[11] The record is not clear with respect to the ultimate resolution of the Texas case involving petitioner and Thurmond.

of $18,508; (3) supplies of $139.50; (4) travel expenses of $1,050; and (5) deductible meals and entertainment of $347.65. The Schedule C listed the "Kirshner Content and related entities" as the business name and the activity was listed as "Media Content and Entertainment and Songs". Respondent did not agree to deductions for these expenses.

Petitioner argues he is entitled to claim the $7,118 as a bad debt deduction as it relates to various expenses that were incurred in 1994, 1995, and 1996, in connection with the attempted financing for the various Kirshner entities. The expenses were for travel, meals, and entertainment. Although not explicitly stated, as the Court understands, petitioner believed he had a contractual right to be reimbursed for these expenses from Kirshner Global, Kirshner Content, and/or other Kirshner entities. Since he was never reimbursed for these expenses, petitioner contends his claim for reimbursement is an uncollectible bad debt.

Respondent contends the expenses were not created or incurred in connection with a trade or business and questions whether petitioner had the right to be reimbursed for such expenses, and, if so, whether the debts became uncollectible in 2000.

Section 166 allows a taxpayer a deduction for any business debt which becomes wholly or partially worthless during the

taxable year.  Sec. 166(a), (d)(1)(A).  A bona fide debt is one that arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money.  Sec. 1.166-1(c), Income Tax Regs.

A business bad debt deduction is allowable if the taxpayer, among other requirements, establishes:  (1) He was engaged in a trade or business, and (2) the acquisition or worthlessness of the debt was proximately related to the conduct of such trade or business.  United States v. Generes, 405 U.S. 93 (1972); sec. 1.166-5(b), Income Tax Regs.  For a debt to be considered a business debt, it must have a proximate relation to the taxpayer's trade or business.  In determining whether a proximate relationship exists, the proper measure is the taxpayer's dominant motivation for incurring the debt.  A significant motivation is not sufficient.  United States v. Generes, supra at 103.

Petitioner bears the burden of proving that the amounts in question constituted business debts and that such debts became worthless in 2000, the year in which the deduction is claimed.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

At the outset, respondent disputes that expenses were incurred in connection with petitioner's trade or business.  Petitioner argues that he was in the trade or business of

investment and merchant banking. The facts support petitioner on that argument.

Petitioner and Thurmond credibly testified that they were in the trade or business of investment and merchant banking. The totality of the circumstances shows that they sought to obtain financing in return for obtaining a percentage interest in various Kirshner entities. Multiple Kirshner documents show that petitioner was described as the managing director of Equisource Group and responsible for obtaining financing as well as pursuing possible acquisitions.

Petitioner was also slated to be on the board of directors of Kirshner Global once financing was completed. He was listed as executive vice president, chief financial officer, treasurer, and director of Kirshner Content in the February 22, 1996, confidential private placement memorandum. The Court concludes that these activities were not merely investment activities or the management of petitioner's investment but were part and parcel of petitioner's trade or business. Thus, the Court finds that petitioner was engaged in a trade or business with respect to these expenses.

With respect to the claimed bad debts, petitioner must establish that the debts had some value at the beginning of 2000 and became worthless by the end of the year. Milenbach v. Commissioner, 106 T.C. 184, 204 (1996), affd. in part, revd. in

part on other grounds, and remanded 318 F.3d 924 (9th Cir. 2003). The issue rests on the particular facts and circumstances of each case, although, generally, "the year of the worthlessness is fixed by identifiable events that form the basis of reasonable grounds for abandoning any hope of recovery." Id. at 204-205; see also Estate of Mann v. United States, 731 F.2d 267, 276 (5th Cir. 1984); Dallmeyer v. Commissioner, 14 T.C. 1282, 1291-1292 (1950).

Petitioner argues that, under the venture agreement for the formation of Kirshner Global, he was entitled to reimbursement for out-of-pocket costs. Petitioner testified that the venture agreement was one of several such agreements that provided for the formation of Kirshner entities. According to petitioner, these Kirshner entities received interim financing. In addition, petitioner contends he submitted a claim for reimbursement, and it was approved by Kirshner.

Petitioner contends that his business relationship with Kirshner and the Kirshner-related entities "effectively ended" in 2000, thus entitling him to a bad debt deduction for that year. Respondent strongly disagrees with that contention and instead argues the relationship ended in 1995 or 1996. Petitioner testified:

> When Kirshner decided not to do business any more with
> us and go on and do business with someone else then

> there was no hope of getting paid. It was over. And
> that was in the year 2000.

Petitioner contends that all activity on the Kirshner deal ended in the year 2000 due to litigation against Kirshner by an outside investor who had been brought in by petitioner. Up to that point, petitioner contends, he had continued to try to raise capital, reform Kirshner Content, and repay the outstanding debt.

Petitioner offered the testimony of his business partner, Thurmond, with respect to the claimed deduction. However, Thurmond was uncertain when the business relationship definitively ended. He admitted that the actual attempt to fund and operate Kirshner Content ended "a long time ago" but was unable to fix an exact date, other than it was in the late 1990s. At trial, Thurmond stated it was either in 1999 or 2000.[12] While Thurmond believed that several Kirshner entities received interim financing, he could not positively state that Kirshner Global received any interim financing. Thurmond's testimony does not convince the Court that the business relationship ended in the year 2000.

Moreover, the Court is not satisfied from the evidence that there even was a bona fide debt, much less a debt that became wholly worthless in 2000 for the following reasons.

---

[12] Thurmond also stated at one point that it was in 2002 but immediately corrected himself to provide that it was "either 2000 or before".

Respondent argues that there was no "debt" that would qualify for the bad debt deduction. In particular, respondent contends that petitioner did not show that he was entitled to reimbursement for the various expenses at issue.

Respondent asserts that a precondition for obtaining out-of-pocket expenses from Kirshner Global was not fulfilled in that petitioner failed to show that he obtained interim financing within the time period specified in the 1995 venture agreement. At trial, petitioner claimed that his entitlement to reimbursement for expenses was not contingent on obtaining interim financing.

The totality of the record satisfies the Court that respondent is correct. There is no documentation or other evidence that establishes the existence of a bona fide debt owing to petitioner by either Kirshner Global or Kirshner Content (petitioner's Schedule C activity) that qualified for a bad debt deduction. Also, there is no evidence to support a finding that petitioner was contractually entitled to be reimbursed for the various Kirshner expenses that are characterized as a bad debt on Schedule C of petitioner's tax return.

With respect to Kirshner Global, the language of the venture agreement supports respondent's position. In a subsection entitled "Interim Financing", Kirshner Global was required, through the Equisource Group, to obtain interim financing that

would be used to pay, among other things, out-of-pocket costs of the "Founding partners"; i.e., Equisource and Kirshner. Thus, obtaining interim financing was a precondition to petitioner's entitlement to reimbursement for his out-of-pocket expenses.

Petitioner did not establish that interim financing was obtained, that Kirshner Global was formed, or that he became a director on Kirshner Global's board of directors. While petitioner claimed that licensing, employment, and financial advisory agreements were executed in connection with Kirshner Global, there is no evidence that this came about. Thus, the Court cannot conclude that petitioner had a right of reimbursement through Kirshner Global for reimbursement of his expenses.

The record shows that Kirshner Content had a more tangible existence because it apparently obtained interim financing from C&C Partners. However, Kirshner Content, as well as petitioner, Thurmond, and Licht, all became involved in a lawsuit after Kirshner Content defaulted on the promissory note. Receipt of the interim financing and the corporate default both occurred in 1996. Kirshner Content does not appear to have been active after that year other than to participate in various lawsuits. Petitioner's witness, Thurmond, confirmed that the financing for Kirshner Content had not been completed. Moreover, there is no

evidence that Kirshner Content contractually agreed to reimburse petitioner's expenses.

Petitioner points to the existence of an August 11, 1996, reimbursement form signed by Kirshner as proof that petitioner was entitled to reimbursement. The Court disagrees. The document is indicative, at most, that Kirshner approved petitioner's expenses related to "identifying acquisition/investment opportunities for Kirshner Content et al." that were incurred in 1996. Without any corporate identification on the reimbursement form or an identification of petitioner's status as a person requesting reimbursement, the record does not support a finding that petitioner had the contractual right to reimbursement with respect to Kirshner Content and/or any other Kirshner-related entity. Thus, the Court cannot conclude that there was an actual bona fide debt with respect to the $7,118 claimed as a bad debt on Schedule C of petitioner's income tax return.

The Court further notes that petitioner incurred these expenses over a 3-year period and did not seek reimbursement during that time. The claimed expenses were still outstanding 4 years later. There is nothing in the record that adequately explains petitioner's delay in seeking reimbursement, if, in fact, petitioner had incurred such expenses and was entitled to reimbursement.

Even if petitioner was entitled to reimbursement for expenses but was, in fact, not reimbursed, he is not allowed a deduction for such expenses. A taxpayer is not entitled to a deduction for expenses to the extent that the taxpayer is entitled to reimbursement where the taxpayer does not claim reimbursement. Levy v. Commissioner, 212 F.2d 552, 554 (5th Cir. 1954), affg. a Memorandum Opinion of this Court; Universal Oil Prods. Co. v. Campbell, 181 F.2d 451, 475 (7th Cir. 1950); see also Lucas v. Commissioner, 79 T.C. 1, 7 (1982); Kennelly v. Commissioner, 56 T.C. 936, 943 (1971), affd. without published opinion 456 F.2d 1335 (2d Cir. 1972); Stolk v. Commissioner, 40 T.C. 345, 356 (1963), affd. per curiam 326 F.2d 760 (2d Cir. 1964); Podems v. Commissioner, 24 T.C. 21, 22-23 (1955); Roach v. Commissioner, 20 B.T.A. 919, 925-926 (1930).

Moreover, if there was a bona fide debt owing to petitioner, he provided no evidence that the debt became worthless during the year at issue. Sec. 1.166-2, Income Tax Regs. Petitioner offered only his unsupported opinion as to when the debt became worthless. A taxpayer's unsupported opinion that a debt became worthless in a particular year by itself will not normally be accepted as proof of worthlessness. Dustin v. Commissioner, 53 T.C. 491, 501-502 (1969), affd. 467 F.2d 47 (9th Cir. 1972). Respondent is sustained on this issue.

Another deduction claimed on Schedule C of petitioner's income tax return for 2000 was $18,508 for legal and professional services. This amount represented a payment by petitioner on August 28, 2000, to a Houston, Texas, law firm, Baker & Botts. The memorandum line on the check issued for payment of these services indicates that the payment was for "C&C Litigation". Respondent does not dispute that petitioner paid the legal expenses but contends there is no evidence that the payments were related to petitioner's trade or business. Respondent argues that the expenses should, instead, be claimed as an itemized deduction on Schedule A of petitioner's return.

The record shows that the litigation expenses related to C&C Partners arose out of the default on the debt of Kirshner Content that petitioner had guaranteed. As a result, petitioner, Thurmond, and Licht were all required to satisfy guarantees that they had given in connection with the interim financing for Kirshner Content. Petitioner and Thurmond credibly testified that the litigation continued until at least 2000 and that they still owed money to the law firm. Accordingly, the Court finds that the litigation was proximately related to petitioner's trade or business and holds that the fees for legal and professional services are allowable as a business expense deduction and not as a Schedule A deduction. Petitioner is sustained on this issue.

Petitioner testified that, until the first half of 2000, he was "still trying to raise other funds, get other investors, get Kirshner back in the fold, deal with this investor that was having an issue with Kirshner".  According to petitioner, these expenses, consisting of office supplies, meals, and travel, were all incurred on behalf of the entire Kirshner enterprise during the year 2000.

Petitioner's Schedule C of his 2000 Federal income tax return included the following other expenses:

| | |
|---|---|
| Supplies | $  139.50 |
| Travel | 1,050.00 |
| Meals and entertainment (deductible portion) | 347.64 |
| Total | $1,537.14 |

As to meals, entertainment, and travel expenses, section 274(d) imposes stringent substantiation requirements for deductions related thereto.  For travel expenses, including meals and lodging, a taxpayer must substantiate:  (1) The amount of such expense; (2) the time and place such expense was incurred; and (3) the business purpose for which such expense was incurred.  Sec. 1.274-5T(b)(2), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).  Section 274(d) specifically bars a taxpayer from claiming a deduction on the basis of any approximation or the unsupported testimony of the taxpayer.  Sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov.

6, 1985). Thus, section 274(d) overrides <u>Cohan v. Commissioner</u>, 39 F.2d 540, 543-544 (2d Cir. 1930), which allows the Court, in some circumstances, to estimate a deductible expense. See <u>Sanford v. Commissioner</u>, 50 T.C. 823, 827 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5T(a), Temporary Income Tax Regs., <u>supra</u>.

Although petitioner offered into evidence numerous receipts in support of his travel, meals, and entertainment expenses, he did not provide the additional documentation necessary to substantiate these expenses. In particular, the receipts did not show the business purpose behind the trips or meals. In short, there was no documentation or rationale behind such expenses other than petitioner's unsupported testimony that the Court declines to accept. Sec. 1.274-5T(a), Temporary Income Tax Regs., <u>supra</u>. Respondent is sustained on this issue.

On a separate Schedule C of petitioner's 2000 income tax return, petitioner claimed a deduction for expenses relating to another activity called "Frexie". This was the name petitioner ascribed to his purchase of the right to use a luxury suite at Minute Maid Park in Houston, Texas, the home field for the Houston Astros major league baseball team, for a 3-year period for $250,000. The Frexie activity involved the selling or letting by petitioner of the use of the suite during Houston Astros baseball games. In exchange for a commitment to purchase

or use time in the suite, petitioner offered pricing incentives to two corporations, Nabisco and Chicago Title. The two companies agreed to the deal with petitioner. The sole expense at issue in this case is a claimed deduction of $889.52 relating to the activity.[13]

It appears that the expense in question was incurred at one event, which was attended by petitioner and representatives of Nabisco and Chicago Title. The evidence satisfies the Court that the representatives of Nabisco and Chicago Title who attended the game were not there for purposes of entertainment but were there solely for their evaluation and consideration of how the facility would be used to further the business interests of Nabisco and Chicago Title, and petitioner was there to show the facility and address whatever questions the corporate representatives may have had. Petitioner paid for the food and beverages consumed at the event, which amounted to $889.52.

While conceding that petitioner substantiated the expenses and was entitled to claim the $889.52 paid for food and beverages on Schedule C of his return as a business expense, respondent contends that the expense was subject to the 50-percent limitation of section 274(n). Petitioner argued that section

---

[13] Petitioner claimed the $889.52 item as "Returns and Allowances" on Schedule C for the trade or business activity "Frexie". At trial, petitioner clarified that the item was mischaracterized and was properly a claimed business expense of the Schedule C "Frexie" activity.

274(n) was inapplicable because the expenditure was not incurred for entertainment. Petitioner claims that the $889.52 was expended as performance on a contract with Nabisco and Chicago Title in that he was required to pay for catering services regardless of whether business was discussed in the luxury suite. Thus, the Court construes petitioner's argument to be that the 50-percent limitation for food and beverages found in section 274(n) does not apply to the expense at issue because the $889.52 represented goods and services sold by petitioner in a bona fide consideration for an adequate and full consideration in money or money's worth. Sec. 274(e)(8). Accordingly, petitioner argues he was not entertaining guests.

Under section 274(n)(1)(A), any amount allowable as a deduction for "any expense for food or beverages" in connection with a trade or business activity is generally limited to 50 percent of the amount of the expense that would otherwise be allowable. However, section 274(e)(8) provides an exception to the 50-percent limitation of section 274(n)(1) for "Expenses for goods or services * * * which are sold by the taxpayer in a bona fide transaction for an adequate and full consideration in money or money's worth." Sec. 274(n)(2).

Section 1.274-2(f)(2)(ix), Income Tax Regs., provides:

> Any expenditure by a taxpayer for entertainment (or for use of a facility in connection therewith) to the extent the entertainment is sold to customers in a bona

fide transaction for an adequate and full consideration in money or money's worth is not subject to the limitations on allowability of deductions provided for in paragraphs (a) through (e) of this section. Thus, the cost of producing night club entertainment (such as salaries paid to employees of night clubs and amounts paid to performers) for sale to customers or the cost of operating a pleasure cruise ship as a business will come within * * * [the section 274(e)(8)] exception.

Thus, despite the fact that a facility might meet the definition of an entertainment facility and be subject to the general rule of section 274(a)(1)(A), expenses relating to its operation will not constitute "entertainment" expenses if that facility is legitimately involved in "selling" entertainment.

Additionally, section 1.274-2(e)(3)(iii), Income Tax Regs., provides that expenses (exclusive of operating costs and other expenses referred to in section 1.274-2(e)(3)(i), Income Tax Regs.) incurred at the time of an entertainment activity, even though in connection with the use of a facility for entertainment purposes, such as expenses for food and beverages, or expenses for catering, or expenses for gasoline and fishing bait consumed on a fishing trip, shall not be considered to constitute expenditures with respect to a facility used in connection with entertainment.

In Churchill Downs, Inc. v. Commissioner, 115 T.C. 279 (2000), affd. 307 F.3d 423 (6th Cir. 2002), this Court held that a racetrack operator's expenses for hosting press parties, winners' parties, and other entertainment events did not qualify

for the section 274(e)(8) exception to the 50-percent limitation rule of section 274(n) because the expenses were not part of producing the taxpayer's entertainment product and the taxpayer provided the parties free of charge to its guests.

The Court agrees with petitioner that the $889.52 expense at issue is excluded from section 274(n)(1) by virtue of section 274(e)(8). The guests entertained by petitioner were representatives of two corporations that had contracts with petitioner in a bona fide transaction for adequate and full consideration for the subsequent business uses of these corporations.

Petitioner incurred the expenses in question as part of his business. Respondent agrees that the claimed expenses were substantiated. Thus, the Court holds that the food and beverages were sold in a bona fide transaction for adequate and full consideration in money or money's worth. Sec. 274(e)(8); see also secs. 1.274-2(f)(2)(ix), 1.274-2(e)(3)(iii), Income Tax Regs. Accordingly the Court holds that the $889.52 expense is not subject to the 50-percent limitation of section 274(n) and is fully deductible.

At trial, petitioner claimed other expenses in connection with the Frexie activity. He presented a number of receipts for ticket purchases, FedEx deliveries, and miscellaneous items such as programs, scorecards, a baseball cap, and a T-shirt. There

were also other receipts related to food from Aramark in the amount of $67, Mission Burritos Carillon for $13.21, and Frankie B. Mandola's for $26.26. Some of the receipts had no dollar figures, and the connection of these expenses, if any, with Frexie is largely unexplained. The Court holds that these expenses have not been adequately substantiated and, therefore, are not deductible.

On Schedule A for the year 2000, petitioner claimed a deduction of $3,218 for the writeoff of old inventory. Petitioner testified that he had been in the water filter business in prior years. After the business was discontinued, he had on hand an inventory of unsold water filter units. Petitioner presented at trial a copy of a 1989 Schedule C relating to the activity that reflected an inventory valuation of $3,218 in connection with an environmental equipment sales business. Petitioner testified that he reported his income and expenses from that activity on Schedule C of his 1989 income tax return.

Petitioner testified that the business languished for a long period of time and was discontinued, presumably sometime after 1989. He had inventory remaining from the business that was never sold. He had received an offer to sell the inventory in November 1999 for "50 cents on the dollar", which he declined.

Petitioner testified that, in the year 2000, the water filters became inoperable and thus were of no value.

Respondent contends that petitioner provided no documentation to show that he purchased, utilized, and disposed of the water filter inventory. Respondent further contends that petitioner's Schedule C for petitioner's 1989 tax year standing alone is insufficient to demonstrate that petitioner was in a business activity for the sale of environmental equipment. Respondent further argues that there is no proof that petitioner filed a return for 1989.

The record does not show that petitioner either purchased or held a water filter inventory and, if he did, what was the cost of that inventory. The Court rejects petitioner's entitlement to a deduction on this issue.

The Court next addresses the addition to tax under section 6651(a)(1) for failure to file a timely 2000 income tax return.

Section 6651(a)(1) provides for an addition to tax for failure to file a timely Federal income tax return unless the taxpayer shows that such failure was due to reasonable cause and not willful neglect. United States v. Boyle, 469 U.S. 241, 245 (1985); Baldwin v. Commissioner, 84 T.C. 859, 870 (1985); Davis v. Commissioner, 81 T.C. 806, 820 (1983), affd. without published opinion 767 F.2d 931 (9th Cir. 1985).

The addition to tax under section 6651(a)(1) is based on respondent's determination that petitioner failed to file an income tax return for 2000.

Petitioner's income tax return was due to be filed on or before April 15, 2001. He had requested timely and was granted an extension to file his 2000 tax return by August 15, 2001. He never filed the return until the statutory notice of deficiency was issued. At trial, petitioner claimed that he had filed his 2000 tax return timely. No evidence, however, was presented to support that claim. Respondent is sustained on this issue.

Petitioner's Federal income tax return for 2000 that was submitted at trial included a Schedule D, Capital Gains and Losses, on which petitioner claimed a $5,938.46 short-term capital loss and a long-term capital loss of $248,643.20. On the stipulation of facts that was filed by the parties, a basis for settlement was agreed to with regard to petitioner's Schedule D.

Reviewed and adopted as the report of the Small Tax Case Division.

Decision will be entered

under Rule 155.