T.C. Memo. 2013-2

UNITED STATES TAX COURT

GERRY M. GRIGGS, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4395-09.                                    Filed January 7, 2013.

Gerry M. Griggs, pro se.

Derek B. Matta, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, Chief Judge:  Respondent determined a $21,546 deficiency in petitioner's 2004 Federal income tax, as well as a $4,309 accuracy-related penalty under section 6662.[1]  After concessions, the issues for decision are:  (1) whether

_____

[1]Unless otherwise indicated, all section references are to the Internal

(continued...)

[*2] petitioner is entitled to a $4,108 net operating loss (NOL) carryforward deduction with respect to his sole proprietorship, Frexie; (2) whether the gross receipts for petitioner's "merchant banker" sole proprietorship are properly reduced for certain amounts that he contends represented expense reimbursements; (3) whether petitioner is entitled to a depreciation deduction with respect to certain geophysical equipment he allegedly owned and leased out as part of his alleged equipment leasing business; (4) whether petitioner is entitled to certain mortgage interest deductions; and (5) whether petitioner is liable for the section 6662 accuracy-related penalty.[2]

---

[1](...continued)
Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts have been rounded to the nearest dollar.

[2]At trial petitioner conceded that he is not entitled to $13,396 of depreciation deductions claimed on Schedule E, Supplemental Income and Loss (From rental real estate, royalties, partnerships, S corporations, estates, trusts, REMICs, etc.), of his Form 1040X, Amended U.S. Individual Income Tax Return, for tax year 2004 and that $661 of the $51,355 in claimed home mortgage interest deductions is attributable to principal and not deductible. On brief respondent conceded that petitioner is entitled to an itemized deduction on Schedule A, Itemized Deductions, of $9,151 for real estate taxes paid or incurred in 2004. The parties conceded several other issues in the stipulation of settled issues.

[*3] The parties have stipulated some facts, which we incorporate by this reference.[3] When he petitioned the Court, petitioner resided in Texas.

Petitioner is no stranger to this Court. Between 2006 and 2008 he litigated three cases in this Court regarding his tax liabilities for tax years 2000, 2001, and 2002, respectively.[4] Each of those cases involved issues identical or similar to those that petitioner has raised in this case.

## FINDINGS OF FACT

A. Frexie

In 2004 petitioner operated a sole proprietorship called Frexie. Through Frexie, petitioner rented out a luxury suite in Minute Maid Park, the Houston

---

[3]After trial the Court ordered the parties to file simultaneous opening briefs and simultaneous reply briefs. Petitioner's one-sentence opening brief stated, in its entirety, that he would rely solely upon the documentary evidence and oral testimony presented at trial to sustain and support his position. After respondent filed his opening brief, petitioner requested and received an extension of time to file a reply brief but failed to do so. We consider petitioner to have waived any objections to respondent's proposed findings of fact. See Rule 151(e)(3) ("In an answering or reply brief, the party shall set forth any objections, together with the reasons therefor, to any proposed findings of any other party[.]"); Arnold v. Commissioner, T.C. Memo. 2008-228.

[4]See Griggs v. Commissioner, T.C. Memo. 2008-234 (2002 tax year); Griggs v. Commissioner, T.C. Summary Opinion 2007-3 (2000 tax year); Griggs v. Commissioner, T.C. Summary Opinion 2006-159 (2001 tax year).

[*4] Astros' baseball stadium. According to his testimony, he sold game tickets to the suite to businesses, doctors, lawyers, and "rich people".

B. Merchant Banker Activity

Petitioner, along with his business partner Robert H. Thurmond III (Thurmond), provided financial advisory services through their affiliated activity known as the Equisource Group (Equisource). In August 2001 petitioner and Thurmond, as managing directors of Equisource, contracted to provide financial advisory services to Kodiak Technologies, Inc. (Kodiak).[5] The contract required Kodiak to reimburse Equisource for direct out-of-pocket expenses for which Kodiak had given prior approval. Expenses were to be reimbursed within seven days upon submission of appropriate documentation.

C. Equipment Leasing Activity

In 1983 petitioner, along with several partners, formed Advanced Energy Technology (AET) to develop and commercially exploit Electromagnetic Array Profiling (EMAP) technology, which is used to aid in the search for oil and gas.[6]

_____

[5]Petitioner founded Kodiak in 1997 and worked for the company until May 2001.

[6]Petitioner testified that this technology was developed at the University of Texas and licensed to AET. It is unclear from the record, however, how AET or MTEM acquired ownership rights to the equipment in question.

[*5] In 1986 petitioner, Richard Rosen (Rosen), and James Baker (Baker) formed another company, MTEM Associates (MTEM), to provide capital to AET to further develop commercial EMAP equipment on MTEM's behalf. Under this arrangement MTEM would own the equipment and lease it to AET. Also in 1986, petitioner sold a controlling interest in AET to Halliburton. AET continued to develop the EMAP technology until 1988 or 1989 when Halliburton gave up its controlling interest in the company. Once that happened, AET was no longer able to make lease payments on the equipment to MTEM. At that point, petitioner, through MTEM, sought to terminate the lease of the EMAP equipment to AET. According to petitioner's testimony, the equipment was then "in different parts of the world. It was in Japan; it was in South America." At some point after AET terminated operations, Ted Daniels (Daniels), a former AET employee, sought to acquire the assets of AET (including the EMAP equipment) through a lawsuit against AET. According to petitioner's testimony, Daniels eventually acquired the leasehold estate in the EMAP equipment pursuant to a court order that also prohibited petitioner from interfering with the equipment's use for the remaining life of the lease.

In the mid-1990s petitioner acquired all of Rosen's and Baker's MTEM shares. After acquiring full control of MTEM, petitioner, in his individual

[*6] capacity, sought to purchase the EMAP equipment and the lease from MTEM. In 2000 petitioner had the equipment appraised, and he contracted to purchase it from MTEM for $500,000.[7] Petitioner does not have possession of the EMAP equipment and does not know its current location. No one has received lease payments for the EMAP equipment since 1990. According to petitioner's testimony, Daniels automatically renewed the lease in 2004 by failing to return the equipment.

D. Real Estate Transactions

   1. Sage Road Property

In 2002 petitioner and his then fiance, Jamie Burrows (Burrows), purchased a house at 107 Sage Road in Houston, Texas (Sage Road property). The purchase was financed, at least in part, by a $680,000 mortgage from America's Wholesale Lender. Burrows was the sole obligor on the loan agreement. In 2003 petitioner transferred his interest in the Sage Road property to MTEM. For reasons not explained in the record, it appears that the mortgage was later assumed by Countrywide Home Loans (Countrywide). In 2004, after petitioner and Burrows separated, Burrows refinanced the Sage Road property for $731,000 using a

---

[7]This agreement is reflected in a bill of sale between petitioner and MTEM. The record does not establish that petitioner has paid MTEM any amount for the purchase of the equipment.

[*7] mortgage from GreenPoint Mortgage Funding, Inc. (GreenPoint). The settlement statement indicates that $690,521 of the proceeds were applied to "payoff of existing loans". Burrows incurred a $14,900 loan origination fee as part of the refinancing.

2. Chimney Rock Property

Petitioner is the owner of a house at 1258 Chimney Rock Road in Houston, Texas (Chimney Rock property). In March 2001 petitioner refinanced this property for $170,000. In connection with this refinancing, he incurred a $400 loan origination fee and $3,400 of charges described in the HUD-1A form as "points/prepaid interest".

In 2002 petitioner again refinanced the Chimney Rock property, this time for $367,500, of which $168,924 was used to repay the 2001 loan. In connection with the 2002 refinancing, he incurred a $3,675 loan origination fee, a $300 processing fee, and a $375 broker administration fee, among other charges.

E. Petitioner's Tax Returns

Petitioner timely requested and was granted an extension of time to file his 2004 Federal income tax return. On October 17, 2005, he filed a Form 1040, U.S. Individual Income Tax Return (original return), for his 2004 tax year, listing his filing status as single. On July 31, 2006, he submitted another Form 1040 (first

[*8] amended return) for his 2004 tax year. On June 12, 2008, while respondent's Appeals Office was reviewing petitioner's return, petitioner submitted a Form 1040X (second amended return) for his 2004 tax year.[8]

On a Schedule C, Profit or Loss From Business (Sole Proprietorship), attached to his original return, petitioner reported that Frexie had net profit of $8,281 ($9,136 gross receipts less $855 total expenses). On his first amended return he reported Frexie's net profit as $4,108 ($4,472 gross receipts less $364 total expenses). On his second amended return he reported that this net profit was wiped out by a $4,108 NOL carryforward from an unspecified "prior year".

On a separate Schedule C attached to his original return petitioner reported $40,579 net profit ($148,800 gross receipts less $108,221 total expenses) from his "merchant banker" business, which apparently encompassed his Equisource activities.[9] On his first amended return petitioner reported a net profit from his

---

[8]Insofar as the record reveals, respondent did not accept or process either the first or the second amended return, although respondent appears to have taken into account some of the items reported on at least the first amended return. Petitioner's litigating position in this proceeding is based in part on amounts he reported on his amended returns.

[9]Since Equisource was represented to be an activity of petitioner and Thurmond, we assume that the numbers on the Schedule C represent petitioner's allocable share of the income.

[*9] merchant banker business of $49,483 (gross receipts of $148,476 less total expenses of $98,993).

On other Schedules C attached to his original return and his first amended return petitioner reported, with respect to his "equipment/asset leasing" business, a $90,087 net loss (zero gross receipts less $90,000 of cost of goods sold and $87 of office expenses). On his second amended return petitioner did not attach a Schedule C for an equipment leasing business. Instead, he attached a Schedule C for a "Management/Merchant Bank" business that appears to have combined his equipment leasing and merchant banker businesses that he previously had reported on separate Schedules C. On this combined Schedule C he reported a net loss of $65,455 (gross receipts of $102,955 less total expenses of $168,409, including depreciation of $133,483).[10]

On his original return petitioner claimed a deduction for $35,006 in home mortgage interest and points on his Schedule A. On both his first amended return

---

[10]The $133,483 of claimed depreciation appears to have comprised the $90,000 of "cost of goods sold" claimed on the "equipment leasing" Schedules C attached to petitioner's original return and first amended return, plus $56,879 of depreciation claimed on the merchant banker Schedules C from petitioner's original return and first amended return, minus $13,396 that petitioner originally claimed as residential rental property depreciation on Schedule C and apparently moved to his Schedule E as a depreciation expense on his second amended return. As mentioned above, at trial petitioner conceded that he was not entitled to the $13,396 deduction.

**[*10]** and his second amended return petitioner claimed $43,748 in home mortgage interest deductions and $7,553 of points, for a total of $51,301.

F. Respondent's Determinations

The determinations in the notice of deficiency are shown as adjustments to the amounts reported on petitioner's original return, although in certain instances the determinations reflect amounts reported on petitioner's first amended return.

In the notice of deficiency, on the basis of an analysis of Frexie's income and expenses, respondent determined that Frexie had Schedule C net profits of $3,164. Respondent allowed no amount of NOL carryforward.

Respondent determined that petitioner's Schedule C gross receipts for his merchant banker business were $148,476, as petitioner reported on his first amended return. Respondent disallowed, for lack of substantiation, $27,370 of the $108,221 of total expense deductions that petitioner had claimed on his Schedule C with respect to his merchant banker activity.

Respondent disallowed, for lack of substantiation, the $90,000 cost of goods sold deduction that petitioner had claimed on the Schedule C for his equipment leasing activity. Respondent allowed no depreciation deduction as petitioner claimed on his second amended return.

**[*11]** In the notice of deficiency respondent disallowed the $35,006 of mortgage interest deductions petitioner had claimed on his original return on the ground that petitioner had not shown that this amount was an interest expense or that it was paid.

OPINION

I.  Burden of Proof

The Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer generally bears the burden of proving that the determinations are incorrect.  Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Petitioner does not contend and the record does not establish that he has met the requirements of section 7491(a) to shift the burden of proof to respondent as to any relevant factual issue.

Deductions are a matter of legislative grace; petitioner has the burden of proving that he is entitled to the deductions claimed.  See Rule 142(a)(1); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  Petitioner also bears the burden of substantiating the amount and purpose of any items claimed as deductions.  See sec. 6001; Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), aff'd per curiam, 540 F.2d 821 (5th Cir. 1976).

[*12] II. Net Operating Loss Carryforward for Frexie

Petitioner asserts in this proceeding, consistent with his position on his second amended return, that Frexie's net profits for 2004 should be offset by an NOL carryforward. In general, a taxpayer is entitled to deduct, as an NOL for a taxable year, an amount equal to the sum of the NOL carryovers and NOL carrybacks to that year. Sec. 172(a). A taxpayer claiming an NOL deduction must file with his return "a concise statement setting forth the amount of the * * * [NOL] deduction claimed and all material and pertinent facts relative thereto, including a detailed schedule showing the computation of the * * * [NOL] deduction." Sec. 1.172-1(c), Income Tax Regs. Petitioner bears the burden of establishing both the existence of NOLs for the prior years and the amount that may be carried forward to the year in issue. See Rule 142(a); Keith v. Commissioner, 115 T.C. 605, 621 (2000).

Petitioner has produced no evidence, apart from his vague and general testimony, to substantiate his claimed NOL carryforward. His testimony does not detail when the NOL was allegedly incurred, the amount allegedly incurred, or the amount allegedly available to be carried forward to 2004. Moreover, petitioner failed to attach the required schedule to any of his 2004 returns and failed to provide returns for any other year or any other evidence showing that he incurred a

[*13] loss which could be carried forward to the 2004 tax year. Petitioner has failed to show that he is entitled to the claimed NOL carryforward deduction for Frexie.[11]

III. Gross Receipts From Merchant Banker Activity

Petitioner claims that he erroneously included $45,845 of nontaxable reimbursements in the $148,476 of gross receipts from his merchant banker business as reported on his first amended return.[12] He claims that in 2004 Kodiak reimbursed him for expenses incurred from 2000 to 2004. To support this claim, at trial petitioner submitted 89 pages of expense reports, receipts, invoices, and other miscellaneous documents.[13]

Petitioner has failed to establish that these expense reports were ever submitted to Kodiak or that he received reimbursement payments through his

---

[11]In their stipulation of settled issues the parties agreed as to all other issues involving Frexie's gross receipts and allowable expense deductions.

[12]In their stipulation of settled issues, the parties agreed as to the allowable amounts of various expense deductions as to which respondent had made adjustments in the notice of deficiency.

[13]Some of the invoices submitted are for sports memorabilia purchases by petitioner which Thurmond testified were not expenses covered by the contract between Kodiak and Equisource. In addition, two of the expense reports submitted are for the year 2000, a year before the contract requiring reimbursement became effective. Finally, many of the documents submitted are duplicates.

[*14] merchant banker business in 2004. He failed to provide copies of reimbursement checks, deposit slips, or any other documentation to show that in 2004 Kodiak reimbursed him for over $40,000 of expenses. Petitioner failed to show that he received prior approval from Kodiak for the expenses reported and did not corroborate his claims by having former Kodiak personnel testify. Petitioner also did not substantiate the exact amounts of his alleged expenditures on behalf of Kodiak.

We sustain respondent's determination that the 2004 gross receipts of petitioner's merchant banker business were $148,476, as reported on his first amended return.

IV. Depreciation Deductions for Petitioner's Alleged Equipment Leasing Business

On his original return and first amended return, petitioner reported $90,000 in cost of goods sold for an alleged equipment leasing business. On his second amended return he appears to have recharacterized the reported $90,000 cost of goods sold as a $90,000 depreciation deduction on a Schedule C for his combined merchant banking business and equipment leasing business. In any event, in this proceeding he claims he is entitled to a $90,000 depreciation deduction for EMAP equipment allegedly leased by Daniels.

**[\*15]** In general, section 167(a) allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in a trade or business or held for the production of income. Not only must the taxpayer establish the existence of a trade or business; he or she must also prove that the asset in question is used in the trade or business. See Steen v. Commissioner, 508 F.2d 268 (5th Cir. 1975), aff'g 61 T.C. 298 (1973). Depreciation is not allowable on property until the trade or business is in actual operation. See Richmond Television Corp. v. United States, 345 F.2d 901 (4th Cir. 1965), vacated and remanded on other grounds, 382 U.S. 68 (1965); Witecki v. Commissioner, T.C. Memo. 1963-256. Depreciation begins when the property is placed in service by the taxpayer; i.e., when it is first placed in a state of readiness for its assigned function in the business or income-producing activity. Secs. 1.167(a)-10(b), 1.167(a)-11(e)(1)(i), Income Tax Regs.

The total amount of depreciation allowable for any asset is measured by its cost or other basis in the hands of the taxpayer. See secs. 1.167(a)-1(a), 1.167(b)-1(a), Income Tax Regs. To establish property's depreciable basis, a taxpayer must show the cost of the property, its useful life, and the previously allowable depreciation. Cluck v. Commissioner, 105 T.C. 324, 337 (1995).

[*16] Petitioner has failed to establish that he is entitled to any depreciation deduction for the EMAP equipment. He produced no records to substantiate his claim that he was engaged in an equipment leasing business or that the EMAP equipment was used in this business. The existence of any such business is further called into question by petitioner's testimony that he did not know where the equipment was and that no one had received any payments on the lease since 1990. Further, petitioner did not establish when the equipment was placed into service, and he submitted no evidence to establish the cost of the equipment, its useful life, or any previously allowable depreciation. We conclude and hold that petitioner is not entitled to the claimed $90,000 depreciation deduction. Because petitioner has not otherwise shown error in respondent's determination disallowing the $90,000 cost of goods sold that petitioner claimed on his original return and his first amended return, we sustain respondent's determination.

## V. Mortgage Interest Deductions

Although petitioner claimed home mortgage interest deductions of $35,006 on his original return and $51,301 on his first amended return and his second amended return, at trial he indicated that he believed he was entitled to deduct $50,694. This amount is a combination of deductions associated with his Sage Road property and the Chimney Rock property.

**[*17]** A. <u>Qualified Residence Interest</u>

As a general rule, individuals may not deduct personal interest. Sec. 163(h). One of the limited exceptions to this general rule permits individuals to deduct qualified residence interest. Sec. 163(h)(2).

Section 163(h)(3)(A) defines qualified residence interest as any interest paid or accrued during the taxable year on:

(i) acquisition indebtedness with respect to any qualified residence of the taxpayer, or

(ii) home equity indebtedness with respect to any qualified residence of the taxpayer.

Acquisition indebtedness is debt incurred to acquire, construct, or improve a "qualified residence" and that is secured by that residence. Sec. 163(h)(3)(B)(i). The aggregate amount treated as acquisition indebtedness for any period cannot exceed $1 million ($500,000 for a married individual filing a separate return). Sec. 163(h)(3)(B)(ii). Acquisition indebtedness includes debt incurred in refinancing acquisition indebtedness, insofar as the new debt does not exceed the refinanced debt. Sec. 163(h)(3)(B)(i) (flush language). Home equity indebtedness is indebtedness, other than acquisition indebtedness, secured by a "qualified residence", but the home equity indebtedness cannot exceed the fair market value

**[*18]** of the residence reduced by the qualified acquisition indebtedness.  Sec.

163(h)(3)(C)(i).  The aggregate amount treated as home equity indebtedness for any

period cannot exceed $100,000 ($50,000 for a married individual filing a separate

return).  Sec. 163(h)(3)(C)(ii).  A qualified residence is a taxpayer's principal

residence and one other residence which, for the tax year, qualified as a residence

within the meaning of section 280A(d)(1).  Sec. 163(h)(4)(A)(i).

Qualified residence interest is limited where the sum of the average balances

for the taxable year of all secured debts on a qualified residence exceeds the

adjusted purchase price of the qualified residence (determined as of the end of the

taxable year).  Sec. 1.163-10T(c)(1), Temporary Income Tax Regs, 52 Fed. Reg.

48411 (Dec. 22, 1987).  If qualified residence interest is so limited, the taxpayer

must use either the simplified method or the exact method to determine the amount

of interest that is qualified residence interest.  Id.

For interest to be deductible, it generally must be on the taxpayer's own

indebtedness, not the indebtedness of another.  Smith v. Commissioner, 84 T.C.

889, 897 (1985), aff'd without published opinion, 805 F.2d 1073 (D.C. Cir. 1986);

Abarca v. Commissioner, T.C. Memo. 2012-245, at *13-*14.  As an exception to

this general rule, interest that the taxpayer pays on a mortgage upon real estate of

which he or she is the legal or equitable owner may be deductible, even though the

**[\*19]** taxpayer is not directly liable upon the bond or note secured by such mortgage. Sec. 1.163-1(b), Income Tax Regs.

Points are amounts a borrower pays for loan processing; they can be either for the use or forbearance of money or for specific services the lender performs in connection with the loan. Cao v. Commissioner, T.C. Memo. 1994-60, aff'd without published opinion, 78 F.3d 549 (9th Cir. 1996). If points are paid for the lender's services, they are not deductible. Id. Thus, fees charged to obtain a loan are not deductible interest. See Goodwin v. Commissioner, 75 T.C. 424, 440-441 (1980), aff'd without published opinion, 691 F.2d 490 (3d Cir. 1982); Lay v. Commissioner, 69 T.C. 421, 437-440 (1977).

On the other hand, if points are paid solely for the use or forbearance of money, they constitute interest and are deductible under section 163. Cao v. Commissioner, T.C. Memo. 1994-60. In general, if points constitute interest, they are treated as prepaid interest and generally must be capitalized and amortized over the term of the loan under section 461(g)(1). As an exception to this general rule, section 461(g)(2) provides that points may be immediately deductible if "paid in respect of any indebtedness incurred in connection with the purchase or improvement of, and secured by, the principal residence of the taxpayer". Points that are incurred in a loan refinancing generally do not fall within the exception

**[*20]** provided in section 461(g)(2) because they are not incurred in connection with the purchase or improvement of the taxpayer's principal residence; such points generally must be amortized over the life of the loan in accordance with the general provisions of section 461(g)(1). Cao v. Commissioner, T.C. Memo. 1994-60 (citing Fox v. Commissioner, T.C. Memo. 1989-232, aff'd without published opinion, 943 F.2d 55 (9th Cir. 1991)).

### B. Sage Road Property

#### 1. America's Wholesale Lender/Countrywide Mortgage Interest Payments

Petitioner argues that he is entitled to deduct $26,491 as interest paid to Countrywide in 2004 with respect to the Sage Road property.[14] To substantiate this deduction, petitioner submitted two partial Forms 1098, Mortgage Interest Statement, from Countrywide showing $1,931 and $51,052 in interest payments Countrywide received in 2004. Both forms are addressed to Burrows. Petitioner also submitted copies of the front sides of two personal checks from petitioner's bank account issued to Countrywide for $4,530 and $377. Finally, petitioner

---

[14]Petitioner asserts that he is entitled to deduct this amount because it is one half of the total of $52,983 in interest allegedly paid to Countrywide in 2004.

[*21] submitted five personal checks issued to Burrows, which he testified were for interest payments on the Countrywide mortgage.[15]

Respondent does not dispute that petitioner had a legal or equitable ownership interest in the Sage Road property. Respondent also has not raised any issue as to whether the Sage Road property was petitioner's qualified residence in 2004. On brief respondent concedes that for 2004 petitioner made $4,246 in interest payments to Countrywide.[16] Petitioner has not established that he paid Countrywide any additional amounts for 2004 or that the amounts he paid to Burrows were interest payments on the mortgage.[17]

We conclude and hold that the $680,000 mortgage represented acquisition indebtedness with respect to the Sage Road property and that petitioner is entitled to a $4,246 deduction for the mortgage interest he paid to Countrywide in 2004.

---

[15]Two checks, dated December 10 and 29, 2003, are for $3,400 each. Two checks, dated January 28 and February 5, 2004, are for $1,500 each. One check, dated April 24, 2004, was issued by MTEM for $3,400.

[16]Respondent conceded that the two checks petitioner issued to Countrywide were for interest payments, less $661 that petitioner conceded was paid towards principal.

[17]Petitioner failed to call Burrows as a witness to corroborate his testimony. As a result, we infer that her testimony would have been unfavorable. See Pollack v. Commissioner, 47 T.C. 92, 108 (1966), aff'd, 392 F.2d 409 (5th Cir. 1968).

**[*22]**    2. America's Wholesale Lender/Countrywide Mortgage Points

Petitioner argues that he is entitled to $253 in interest deductions for points associated with the Countrywide mortgage. Petitioner has failed to establish, however, that any points were charged or that he paid any points in connection with the 2002 settlement. Petitioner is not entitled to the $253 deduction for points on the Countrywide mortgage.

    3. GreenPoint Mortgage Interest and Points

Petitioner argues that he is entitled to deduct $17,257 as mortgage interest paid to GreenPoint in 2004. Petitioner argues that this includes one-half of the $14,900 loan origination fee that Burrows incurred when she refinanced the Sage Road mortgage with GreenPoint Mortgage in 2004.

Respondent does not dispute that petitioner paid $17,257 of interest to GreenPoint Mortgage in 2004 but contends that petitioner has failed to show which amounts were home equity, acquisition, or personal indebtedness. The GreenPoint mortgage was a refinancing of acquisition indebtedness. Consequently, it is acquisition indebtedness only to the extent that the amount of new debt incurred did not exceed the amount of the refinanced debt. See sec. 163(h)(3)(B)(i) (flush language). The amount of new debt exceeded by $51,000 the amount of the original mortgage debt that was incurred in 2002. We are

[*23] unable to determine from the record by how much the amount of the new debt exceeded the refinanced debt as of the time of the refinancing in 2004 because the record does not indicate the amount of petitioner's and Burrows' principal payments on the refinanced debt between 2002 and 2004. Petitioner admits that some portion of the amounts paid on the original mortgage was principal payments, thus reducing the amount of principal and acquisition indebtedness at the time of the 2004 refinancing. According to the settlement statement, the refinancing proceeds were applied to pay off "existing loans" of $690,521, but these existing loans are not otherwise identified in the record.[18] Consequently, on this record petitioner has failed to show and we are unable to determine how much of the new debt resulting from the refinancing represents acquisition indebtedness. Moreover, because the record is devoid of evidence about the fair market value of the Sage Road property, we are unable to determine how much, if any, of the new debt might represent home equity indebtedness.

In addition, petitioner has not established what amount of the $14,900 loan origination fee, if any, should be considered qualified interest, especially since the

---

[18]The settlement statement refers to an attachment further describing the payoff of existing loans, but this attachment is missing from petitioner's exhibit.

**[*24]** evidence does not establish that no part of the origination fees represented

fees the lender charged for Burrows to secure the loan.[19]

### C. Chimney Rock Property

Petitioner argues that he is entitled to deduct the points he paid on the 2001

and 2002 refinancings of the Chimney Rock property.

#### 1. 2001 Refinancing

Petitioner argues that he is entitled for 2004 to deduct $127 of points

allegedly paid with respect to the 2001 refinancing. He arrives at this number by

summing the $3,400 of points/prepaid interest and the $400 loan origination fee and

dividing the resulting $3,800 total by 30, on the basis that it was a 30-year

loan.[20]

---

[19]Even if we were to assume, for the sake of argument, that petitioner paid some amount of the origination fee that is properly characterized as qualified interest, this interest would have to be amortized over the period of the loan and treated as paid in the period to which it is allocable. See sec. 461(g)(1). Petitioner contends that the loan had a term of 30 years, or 360 payments, and that four payments were due in 2004. Accordingly, petitioner would be entitled to no more than 4/360 of the points that he paid and that were properly characterized as qualified interest. But for the reasons discussed above, petitioner has failed to establish that he is entitled to deduct even this small amount of the origination fees that Burrows incurred.

[20]Petitioner previously tried unsuccessfully to deduct the same points and prepaid finance charges associated with this refinancing on his 2001 tax return and litigated the issue in Griggs v. Commissioner, T.C. Summary Opinion 2006-159.

<span style="float:right">(continued...)</span>

[*25] Petitioner has provided no evidence of the amount of the original acquisition indebtedness, if any, or the fair market value of the Chimney Rock property. He has thus failed to show what amount of the refinanced debt, if any, is acquisition indebtedness or home equity indebtedness and has failed to show that he is entitled to deduct for 2004 any of the amounts that he characterizes as points paid with respect to the 2001 refinancing.

### 2. 2002 Refinancing

Petitioner argues that he is entitled to deduct $145 for 2004 because $4,350 (representing the sum of a $3,675 loan origination fee, a $300 processing fee, and a $375 broker administration fee) constitutes qualified points which are amortizable over the 30-year period of the loan.

The $300 "processing fee" and the $375 "broker administration fee" were for services rendered in connection with petitioner's obtaining the loan and so are not deductible. See Lange v. Commissioner, T.C. Memo. 2005-176. The $3,675 loan origination fee is described in the settlement statement as "1.000%". But

[20](...continued)
In that case, the Court found that petitioner failed to show that his points were qualified residence interest within the meaning of sec. 163. Respondent argues that petitioner is thus collaterally estopped from claiming the same deduction in this case. Because we decide this issue in respondent's favor on the basis of the trial record, we need not and do not reach respondent's collateral estoppel argument. See Mitchell v. Commissioner, 131 T.C. 215, 217 n.2 (2008).

**[\*26]** petitioner has offered no additional evidence concerning whether this amount represents prepaid interest or instead a payment for services rendered by the financial institution that provided the financing. Thus, petitioner has failed to show that this amount is not deductible as interest under section 163. Id.

VI. Section 6662(a) Penalty

Under section 6662(a) and (b)(1), a taxpayer may be liable for a penalty of 20% of the portion of an underpayment of tax due to negligence or disregard of rules or regulations. The term "negligence" in section 6662(b)(1) includes any failure to make a reasonable attempt to comply with the Internal Revenue Code; this may include a failure to keep adequate books and records or to substantiate items properly. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. Negligence has also been defined as the failure to exercise due care or the failure to do what a reasonable person would do under the circumstances. See Allen v. Commissioner, 92 T.C. 1, 12 (1989), aff'd, 925 F.2d 348 (9th Cir. 1991); Neely v. Commissioner, 85 T.C. 934, 947 (1985). The term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c).

The Commissioner has the burden of production with respect to accuracy-related penalties. Sec. 7491(c). To meet that burden, the Commissioner must produce sufficient evidence indicating that it is appropriate to impose the penalty.

[*27] See Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Once the Commissioner meets his burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect. Rule 142(a); see Higbee v. Commissioner, 116 T.C. at 446-447.  The taxpayer may meet this burden by proving that he acted with reasonable cause and in good faith. See sec. 6664(c)(1); sec. 1.6664-4(a), Income Tax Regs.

Respondent determined a $4,309 accuracy-related penalty under section 6662(a) for taxable year 2004.  Respondent determined that petitioner's 2004 underpayment of tax was attributable to negligence or disregard of rules or regulations.

Petitioner's records were insufficient to substantiate most of his claimed deductions.  Petitioner was well aware of the substantiation requirements, having litigated three cases in this Court in the past six years.  Respondent has met the burden of production with respect to the penalty for negligence.  Petitioner has not shown, and has not even expressly argued, that he acted with reasonable cause and in good faith.  Accordingly, petitioner is liable for the section 6662(a) penalty for 2004.

**[\*28]** To reflect the parties' concessions and the foregoing,

Decision will be entered

under Rule 155.
