T.C. Memo. 2008-234

UNITED STATES TAX COURT

GERRY MORRIS GRIGGS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20664-06.                    Filed October 21, 2008.

Gerry Morris Griggs, pro se.

<u>Portia N. Rose</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Respondent determined a deficiency of $7,239

in petitioner's Federal tax for 2002, as well as a penalty of

$1,447.80 under section 6662[1], and additions to tax of $325.76

---

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code, and all Rule references are to the Tax
Court Rules of Practice and Procedure.

- 2 -

and $253.37 under section 6651(a)(1) and (a)(2), respectively.
After concessions,[2] the issues left for decision are:  (1)
Whether petitioner is entitled to a casualty loss deduction of
$2,783; (2) whether petitioner is entitled to claimed cost of
goods sold in the amount of $30,220 related to one of the
activities for which he filed a Schedule C, Profit or Loss From
Business; (3) whether petitioner is entitled to deductions
related to another Schedule C activity; (4) whether petitioner is
entitled to a capital loss carryforward of $3,000; and (5)
whether petitioner is liable for the section 6662 penalty.

On the basis of the analysis explained herein, we find (1)
the casualty losses and the capital loss carryforward are not
allowable for lack of substantiation, (2) the costs of goods sold
and various Schedule C deductions are allowed in part based on
the evidence presented, and (3) the section 6662 penalty is
applicable.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.
The stipulated facts and the accompanying exhibits are
incorporated herein by this reference.  Petitioner resided in
Texas at the time his petition was filed.

---

[2]Respondent has conceded the additions to tax determined
under sec. 6651(a)(1) and (2).

Petitioner describes himself as a merchant banker. Petitioner received wages and a Form W-2, Wage and Tax Statement, for tax year 2002. In addition, during 2002 petitioner maintained two activities referred to as "Management and Consulting Services" (MCS) and "MTEM" on respective Schedules C filed with his Form 1040, U.S. Individual Income Tax Return, for the 2002 tax year.

MCS

MCS is a business and consulting company responsible for "putting together deals". During 2002 MCS was involved in three primary transactions: (1) An attempt by petitioner and his partners[3] (which petitioner collectively referred to as Cooling Technologies Group (CTG)) to acquire a thermal container business owned by Coleman Co. (Coleman) on behalf of a third party, Kodiak Technologies, Inc. (Kodiak), a company petitioner helped establish in 1997; (2) an attempt by petitioner and his partners to set up a small business investment company (SBIC) on behalf of the National Veterans Business Development Corp. (NVBDC); and (3) pursuing, as part of CTG, various transactions on behalf of Kodiak. At various times since its founding, petitioner has been an owner, director, creditor, or employee of Kodiak.

---

[3]Although petitioner used the word partners to describe these ventures, petitioner testified that these were not partnerships in a legal sense, but a loose association of people trying to put these deals together.

During 2002 petitioner, as a member of CTG, was engaged in an attempt to purchase a unit of Coleman, which would then be used to further Kodiak's business line.  Petitioner pursued this activity on behalf of Kodiak based on two facts:  (1) That Kodiak was engaged in a nonseasonal business; and (2) that Coleman was primarily a seasonal business with excess capacity during downtime.  The benefit of the deal appeared to be that Kodiak could take advantage of Coleman's excess capacity in order to develop and produce temperature-sensitive shipping containers in a more cost-efficient manner.

This attempt to purchase Coleman did not come to fruition. Instead of CTG entering into an agreement with Coleman, Kodiak and Coleman later attempted to enter into an agreement directly. This venture is described in more detail below and occurred after petitioner returned to Kodiak in late 2002.

Petitioner's activities relating to Kodiak began prior to the year at issue.  Kodiak was a company formed to explore possible ways to improve the shipping of temperature-sensitive products.  Kodiak initially targeted the pharmaceutical industry as one industry that would benefit from commercial-quality shipping containers that did not require the use of regular or dry ice.  Petitioner was one of the founders of Kodiak and was an employee through 2001.  Petitioner left Kodiak and was given a year of severance pay which ran into 2002.  These wages paid in

2002 resulted in the wage income petitioner reported on his 2002 income tax return. In December 2002 petitioner was brought back in to help manage the company because existing management was having problems. During 2002 petitioner was also engaged in pursuing a number of ventures on behalf of Kodiak. This included the Coleman acquisition discussed below.

Once petitioner returned to Kodiak as an employee in 2002, CTG stopped pursuing the Coleman venture described above. Instead, Kodiak attempted to enter into an agreement directly with Coleman.

Another activity petitioner engaged in during 2002 was an attempt to set up a small business investment company (SBIC) on behalf of NVBDC. The goal of setting up an SBIC would be to provide assistance to veterans who were interested in starting their own businesses. Petitioner's attempts to set up a SBIC on behalf of NVBDC ended when the Small Business Administration imposed a moratorium on granting licenses to new SBICs.

Petitioner filed a Schedule C for MCS showing gross receipts or sales of $7,000. Petitioner claimed the following deductions:

| Item | Amount |
|---|---|
| Car and Truck Expense | $400 |
| Depreciation and Section 179 expense deduction | 600 |
| Legal and professional services | 175 |
| Office expense | 6,000 |
| Rent or lease | |
| Vehicles, machinery, and equipment | 730 |
| Other business property | 636 |
| Supplies | 1,427 |
| Other expenses | 1,231 |
| Total | 11,199 |

After deductions, petitioner's Schedule C showed a loss of $4,200.

MTEM

In 2002 MTEM's main function was the purchase and resale of tickets for the use of a luxury suite at Minute Maid Park, home stadium of the Major League Baseball Houston Astros. Petitioner began this venture in 2000 and it continues to the present. Each year, petitioner would purchase the right to use a luxury box at Minute Maid Park. Petitioner would then resell the tickets to use the luxury box. During the first years he owned the luxury box, petitioner would enter into contracts with larger corporate clients in order to mitigate his financial risk. During 2002 petitioner entered into agreements with two corporations, Nabisco and Chicago Title, with each agreeing to purchase one-third of the tickets. This left petitioner with 27 tickets or one-third of the season to sell on his own. Petitioner was unable to sell tickets to every game. Individuals who purchased the use of the

luxury box were also able to purchase additional tickets directly from the Houston Astros' offices.

Petitioner reported gross receipts of $19,782 on the MTEM Schedule C. Petitioner testified that he sold about 15 game tickets of the 27 remaining for use of the luxury box. Petitioner claimed a cost of goods sold of $30,220 and expenses of $636 for meals and entertainment and $1,272 for "Other expenses", resulting in a net loss of $12,346.

Petitioner also initially claimed a $3,000 capital loss carryforward on his return, but after completing the return decided that he did not want to use the carryforward. Petitioner indicated his desire not to claim a capital loss carryforward by inserting a handwritten footnote on his return prior to filing it. At trial, petitioner revisited this issue and stated that if this Court decides that respondent's determinations were correct and as a result he has a higher income, he would like to apply the carryforward to offset a portion of that income.

Petitioner also claimed on his return for 2002 casualty losses relating to four properties he owned: (1)Damage sustained by his car during a flood; (2) damage to a fence that was hit by a car; and (3) the loss of two lithographs.

Petitioner timely requested and was granted an extension of time to file his 2002 income tax return. The return was due on or before October 15, 2003. Respondent examined petitioner's

return and on July 13, 2006, sent petitioner a notice of deficiency that: (1) Disallowed all costs of goods sold and deductions related to petitioner's Schedule C activities; (2) disallowed petitioner's claimed $3,000 loss carryforward; (3) disallowed petitioner's claimed casualty losses; (4) imposed self-employment tax; (5) adjusted the amount of petitioner's itemized deductions based on petitioner's increased income; and (6) imposed an accuracy-related penalty pursuant to section 6662.

At trial, respondent's position was that petitioner had not proven: (1) That either of the Schedule C activities was conducted for profit; (2) that the costs of goods sold and expenses have been paid, or if paid, are allowable in determining gross income or as ordinary and necessary business expenses; and (3) that petitioner had not substantiated the other losses claimed on his return.

On October 11, 2006, petitioner timely petitioned this Court for a redetermination of his tax liability. A trial was held on October 24, 2007, in Houston, Texas.

                                OPINION

Burden of Proof

The Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving, by a preponderance of the evidence, that these determinations are incorrect. Rule 142(a)(1); Welch v.

Helvering, 290 U.S. 111, 115 (1933). Tax deductions are a matter of legislative grace, and a taxpayer has the burden of proving that he is entitled to the deductions claimed. Rule 142(a)(1); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). The burden of proof on factual issues that affect a taxpayer's liability for tax may be shifted to the Commissioner where the "taxpayer introduces credible evidence with respect to * * * such issue." Sec. 7491(a)(1). Petitioner does not claim that the burden of proof shifts to respondent under section 7491(a). In any event, petitioner has failed to establish that he has satisfied the requirements of section 7491(a)(2). On the record before us, we find that the burden of proof does not shift to respondent under section 7491(a).

Deductions

A taxpayer may deduct ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. See sec. 162. To do so, a taxpayer must demonstrate that he was involved in the activity on a continuous and regular basis and that his purpose for engaging in the activity was for income or profit. See Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); Wittstruck v. Commissioner, 645 F.2d 618, 619 (8th Cir. 1981), affg. T.C. Memo. 1980-62; Jasionowski v. Commissioner, 66 T.C. 312, 320-322 (1976); Gentile v.

Commissioner, 65 T.C. 1, 4 (1975); sec. 1.183-2(a), Income Tax
Regs.

For certain kinds of expenses otherwise deductible under
section 162(a), a taxpayer must satisfy substantiation
requirements as set forth in section 274(d) before such expenses
will be allowed as a deduction.  Section 274(d) disallows
deductions for travel expenses, gifts, meals, and entertainment,
as well as for listed property defined by section 280F(d)(4),
unless the taxpayer substantiates by adequate records or by
sufficient evidence corroborating the taxpayer's own statements:
(1) The amount of the expense; (2) the time and place of the
travel or entertainment, or the date and description of the gift;
(3) the business purpose of the expense; and (4) the business
relationship to the taxpayer of the persons entertained.

Profit Motive

Whether the required profit objective exists is determined
on the basis of all the facts and circumstances of each case.
See Hirsch v. Commissioner, 315 F.2d 731, 737 (9th Cir. 1963),
affg. T.C. Memo. 1961-256; Golanty v. Commissioner, 72 T.C. 411,
426 (1979), affd. without published opinion 647 F.2d 170 (9th
Cir. 1981); sec. 1.183-2(a), Income Tax Regs.  While a reasonable
expectation of profit is not required, the taxpayer's objective
of making a profit must be bona fide.  See Wittstruck v.
Commissioner, supra at 619; Elliott v. Commissioner, 84 T.C. 227,

236 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986). The Court gives greater weight to objective factors in making the factual determination than to a taxpayer's mere statement of intent. See Indep. Elec. Supply, Inc. v. Commissioner, 781 F.2d 724 (9th Cir. 1986), affg. Lahr v. Commissioner, T.C. Memo. 1984-472; Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs.

The Court generally considers nine nonexclusive factors for determining whether taxpayers engaged in an activity for profit. Sec. 1.183-2(b), Income Tax Regs. The nine factors are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other activities for profit; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. Id. We will take each entity in turn.

MCS

Petitioner has proven his profit motive in searching out deals for his management company. Petitioner and his witness,

who was a business partner in many of petitioner's ventures and also served in a management role at Kodiak, both testified credibly as to the manner in which they pursued deals and that these types of deals were both petitioner's and his witness's main source of income. Petitioner's witness further testified that it was their general practice to expend their own funds individually in trying to put these deals together with the possibility of reimbursement if the deal went through. Petitioner and his witness both testified that although the risks were great, any profits they might earn could be substantial, either through salaries paid by the resulting entity or any resulting equity interest they might procure. Petitioner and his witness explained that their goal in putting together these deals was trifold. If a deal was successful, petitioner, his witness, and various other partners could profit in any of three ways: (1) Petitioner would become an equity owner of the resulting entity; (2) petitioner would become a salaried executive of the resulting entity; and/or (3) petitioner would be paid a monetary fee for helping to put the deal together.

In support of his argument that petitioner had a business purpose in MCS, petitioner submitted a number of documents, including a draft of a letter of intent between Kodiak and Coleman, which related to the venture started after petitioner returned to a management role at Kodiak in 2002. The letter of

intent is dated November 20, 2002. Included with this letter was a fax cover sheet from Coleman to petitioner's witness.

Petitioner and his witness testified credibly that they both entered into these transactions with a profit motive. Accordingly, we find that petitioner had a valid business purpose for the expenses he claimed on his MCS Schedule C. We will now take each expense in turn and determine whether petitioner has provided the required substantiation.

1. <u>Car and Truck Expenses</u>

Petitioner claimed, and respondent disallowed, a deduction for car and truck expenses of $400. Subsequently, after filing his petition, petitioner submitted a Schedule C showing car and truck expenses of $623.

Petitioner's passenger automobile is listed property under section 280F(d)(4)(A)(i), and is subject to the substantiation requirements of section 274(d).

The only evidence petitioner submitted in support of this deduction is a chart that purports to list the dates, miles, and purposes of what appear to be trips petitioner took. Of the eight trips listed, only three appear to be related to the ventures petitioner testified to pursuing: (1) A trip of 566 miles from Houston to Washington, D.C., and surrounding areas regarding the NVBDC deal; (2) what appears to be a return trip of 480 miles from Washington, D.C., back to Houston, Texas; and (3)

a trip of 220 miles from Houston to Brehham, Texas, and back for a visit regarding "Coleman/Tundra". The remaining five only list generic travel descriptions or reference people and locations petitioner did not address in his testimony.

The amount petitioner claimed for car and truck expenses was listed as $623.16, which coincides with the amount claimed on petitioner's updated Schedule C, indicating that it was prepared in advance of trial. Evidence prepared closer in time to the events generating the deduction is given more weight. See sec. 1.274-5T(c)(1), Temporary Income Tax Regs, 50 Fed. Reg. 46016 (Nov. 6, 1985). Evidence submitted which was prepared long after events giving rise to the expense is therefore accorded less weight. See id. Petitioner has not provided any contemporaneous evidence regarding this claimed deduction. The travel log petitioner submitted was prepared almost 5 years after the costs at issue were allegedly incurred, and petitioner's testimony was vague and imprecise as to the dates, times, and purposes of the trips. Accordingly, petitioner is not entitled to a deduction for car and truck expenses.

2. Depreciation and Section 179 Expense Deduction

Petitioner claimed, and respondent disallowed, a $600 deduction for depreciation and section 179 expense. Section 179 provides that a taxpayer may elect to treat the cost of any section 179 property as an expense which is not chargeable to a

capital account. If a taxpayer makes this election, the cost shall be allowed as a deduction for the taxable year in which the section 179 property is placed in service. Sec. 179(a). Section 179 property is defined in pertinent part as "tangible property", which is section 1245 property (as defined in section 1245(a)(3)), and which is acquired by purchase for use in the active conduct of a trade or business. Sec. 179(d)(1).

Section 179 has its own substantiation and election requirements. The taxpayer must maintain records reflecting how and from whom the section 179 property was acquired and when it was placed in service. Sec. 1.179-5(a), Income Tax Regs. A section 179 election must be made on the taxpayer's first income tax return for the taxable year the property is placed in service, whether or not the return is timely, or on an amended return filed within the time prescribed by law (including extensions) for filing the original return for such year. Sec. 179(c)(1)(B); sec. 1.179-5(a), Income Tax Regs. The section 179 election must specify the total section 179 expense deduction claimed and enumerate the portion of that deduction allocable to each specific item. Sec. 179(c)(1); sec. 1.179-5(a)(1) and (2), Income Tax Regs.

The election is normally made by attaching Form 4562, Depreciation and Amortization, to the taxpayer's return. Visin v. Commissioner, T.C. Memo. 2003-246, affd. 122 Fed. Appx. 363

(9th Cir. 2005); see 2002 Instructions for Schedule C, Profit or Loss From Business, Specific Instructions, Part II. Expenses. A taxpayer who fails to make the election is denied the benefits of section 179.  See Patton v. Commissioner, 116 T.C. 206 (2001); Visin v. Commissioner, supra; Verma v. Commissioner, T.C. Memo. 2001-132; Fors v. Commissioner, T.C. Memo. 1998-158; Starr v. Commissioner, T.C. Memo. 1995-190, affd. without published opinion 99 F.3d 1146 (9th Cir. 1996).

Petitioner has failed to meet the election or substantiation requirements of section 179.  Petitioner did not file a Form 4562 with his Form 1040.  Petitioner instead included with his Form 1040 a typewritten sheet stating "Taxpayer hereby elects: To deduct all designated expenditures as Sec. 179 expenses deductible in the current year."  Petitioner did not testify about this expense.  The only evidence petitioner submitted consisted of an invoice from the Baseball Hall of Fame and copies of checks he had written.  Even if we were to accept petitioner's purported section 179 election, the only evidence petitioner submitted does not include records reflecting how and from whom the section 179 property was acquired and when it was placed in service.  Accordingly, petitioner is not entitled to the section 179 deduction.

3.  Legal and Professional Services

Petitioner claimed, and respondent disallowed, a $175 deduction for legal and professional services on his management and consulting business Schedule C.  At trial petitioner submitted an additional Schedule C showing a deduction of $185 for legal fees.

In general, legal fees are deductible under section 162 only if the matter with respect to which the fees were incurred originated in the taxpayer's trade or business and only if the claim is sufficiently connected to that trade or business.  See United States v. Gilmore, 372 U.S. 39 (1963); Kenton v. Commissioner, T.C. Memo. 2006-13.

Petitioner testified that the legal fees were paid in conjunction with a lawsuit he commenced against his former employer in which petitioner attempted to collect on an employment agreement with that employer.  Petitioner submitted three checks totaling $1,500 which he claimed were payments for legal fees incurred during the lawsuit.  Petitioner did not testify as to the discrepancy between the $185 claimed on his updated Schedule C (or the $175 claimed on his original Schedule C) and the $1,500 shown on the three checks.  Nor did petitioner testify as to how these legal fees were related to his Schedule C business.  Because petitioner testified that these legal fees were paid for the cost of a lawsuit connected with his individual

employment contract, and not with a Schedule C business of his own, the MCS legal fees cannot be deducted.

4.  Office Expense

Petitioner claimed, and respondent disallowed, a deduction for office expenses of $6,000.  Petitioner did not testify in regard to this expense.  Petitioner, however, did submit certain documents which he believes show that he is entitled to a deduction of $6,000 for office expenses.  These documents include:  (1) Houston Astros ticket and food invoices; (2) an invoice from Day-Timers, Inc.; (3) an invoice from Hammacher Schlemmer for assorted desk lamps, a dry-erase board, and a shelving system; and (4) a number of illegible canceled checks.

The Houston Astros ticket invoices appear to be invoices for tickets purchased in addition to petitioner's ownership of the luxury suite.  Petitioner did not provide any evidence showing how these ticket purchases are related to his MCS business.  The Houston Astros food invoices are discussed below.  The Day-Timer's, Inc. invoice is discussed below.  As to the other documents petitioner submitted, petitioner has not substantiated his claimed deduction for office expenses.  Petitioner also has not shown that these costs were ordinary and necessary business expenses and not personal expenditures.  Accordingly, petitioner is not entitled to the office expense deduction.

5.  <u>Rent or Lease</u>

Petitioner claimed, and respondent disallowed, a deduction for rent or lease expense.  Petitioner's original Schedule C for MCS, filed with his 2002 return, included a deduction of $1,365.60.  This figure consisted of $729.60 for the rent or lease of vehicles, machinery, and equipment, and $636 for the rent or lease of other business property.  These amounts were higher than those shown on petitioner's updated Schedule C.  The updated amounts were $732.51 for vehicles, machinery, and equipment, and $595 for other business property.

In support of his claimed deduction for rental or lease costs of vehicles, machinery, and equipment, petitioner submitted the following documents:  (1) An invoice from Jones McClure Publishing, Inc., for a book about civil trial procedure in Texas; (2) an invoice from Sam's Club for what appear to be building materials, and (3) an illegible canceled check.

Petitioner is not entitled to a deduction for the cost of rental or leasing of vehicles, machinery, and equipment.  The only evidence petitioner submitted suggests that the items on the receipts were purchased, not rented or leased.  Neither the receipts nor the check petitioner submitted include any type of lease terms or any evidence whatsoever to indicate that the amounts relate to rent or lease payments.

Petitioner's argument in support of a claimed deduction for rental or lease of other business property also fails because petitioner failed to establish a business purpose for the expenses.  Accordingly, petitioner is not entitled to a deduction for a rental or lease expense of other business property.

6.  Supplies

Petitioner claimed a deduction of $1,427.60 for supplies on his original Schedule C.  This amount increased to $1,736.04 on his updated Schedule C.  Petitioner did not testify in regard to this deduction.  In support of his claim, petitioner submitted the following documents:  (1) Houston Astros ticket and food invoices; (2) assorted canceled checks; and (3) assorted invoices, including invoices from Day-Timers, Inc., Hammacher Schlemmer, and Circuit City, which have already been claimed in other sections of petitioner's return.

The Houston Astros ticket invoices are similar to those claimed as a deduction for office expense.  Accordingly, the invoices provided as substantiation for supplies fail for the same reason.  The ticket invoices are illegible, and do not show the parties involved or mention any possible business purpose. Petitioner has not alleged that these are the tickets used for holding MCS meetings at the luxury box owned as part of petitioner's MTEM business.  Nor has petitioner argued that these costs should have been claimed on the MCS Schedule C.

Petitioner also has not argued that the exception contained in section 274(e)(8) applies.  Petitioner has not shown that these tickets were sold in a bona fide transaction for an adequate and full consideration in money or money's worth.  The Houston Astros food invoices petitioner submitted are discussed below.

The amounts claimed on the other invoices have already been claimed elsewhere on his return.  The Hammacher Schlemmer invoice is discussed above, while the Day-Timers, Inc., and Circuit city invoices are discussed below.  The canceled checks are illegible and do not include the business purpose behind any alleged expenditures.  Accordingly, petitioner is not entitled to a deduction for supplies.

### 7.  Other Expenses

Petitioner claimed a $1,231.25 deduction for other expenses on his original Schedule C.  This amount increased to $3,796.92 on his updated Schedule C.  Petitioner testified and submitted documents in support of this deduction.

Petitioner testified that $623.16 of the total claimed deduction for other expenses was for mileage, but that amount was already claimed as car and truck expenses on the same Schedule C.  We discussed this claimed deduction above, finding that petitioner is not entitled to a deduction for car and truck expenses.

The remainder of petitioner's evidence for this deduction consisted of: (1) Houston Astros ticket stubs and food invoices; (2) an invoice from Day-Timers, Inc. (for a binder costing $69.99 and a camera costing $99.99); (3) an invoice for $169 showing the purchase of what is labeled a briefbag; (4) an invoice from Circuit City Stores, Inc., for the purchase of a camera accessory; and (5) an invoice from Marshall Field's for the purchase of an architect's desk costing $84.15.

Petitioner is not entitled to a deduction for the cost of the Houston Astros ticket stubs and invoices. As discussed above, the ticket invoices fall short of the substantiation petitioner was required to submit in order to prove his entitlement to the deduction. The Houston Astros food invoices will be discussed below.

Petitioner is entitled to a deduction in the amount of $69.99 for the Day-Timers, Inc., binder, which he has established had a business purpose. Petitioner is not entitled to a deduction for the cost of the camera and camera accessory because he has not shown a business purpose for these purchases.

Petitioner is also entitled to a deduction for the cost of the briefbag. Petitioner has shown the business purpose for this expenditure.

Petitioner is also entitled to a deduction for the cost of the architect's desk. Petitioner has shown that the purchase of

an architect's desk was an ordinary and necessary business expense related to his business.

MTEM

### 1. Business Purpose

We now consider petitioner's other Schedule C activity, MTEM. Respondent argues that petitioner has not shown a business purpose for MTEM. Petitioner's and his witness's testimony have convinced us that petitioner had an ongoing profit motive while engaged in this activity. Petitioner's witness testified that petitioner offered him, but he declined, an opportunity to join in this venture. Petitioner testified credibly that although he often broke even on the sale of regular season games, there was a much higher profit potential for sale of the luxury box for the Major League Baseball All-Star Game[4] and for sale during Houston Astros home playoff games when they made the playoffs. Petitioner's witness also testified as to petitioner's belief that he would earn substantial profits if the Houston Astros were to advance far into the playoffs or make it to the World Series. Petitioner testified that he was able to sell or rent the luxury box for about 15 of the remaining 27 games. At trial, petitioner testified that the luxury box was occasionally used in relation to his business conducted under MSM. Petitioner's witness

---

[4]The 2004 Major League Baseball All-Star game was played in Houston, Texas at Minute Maid Park.

corroborated this testimony, stating that the luxury box was used for the business of MSM because it was the most convenient place to get everyone involved together. Petitioner's witness also testified about a meeting held at petitioner's luxury box regarding the NVBDC; however, petitioner did not provide any documentation relating to that meeting. Since 2002 petitioner has continued this business and claimed to have made a profit on the sale of the use of the luxury box in 2004, 2005, 2006, and 2007. Accordingly, we find that petitioner has met his burden of showing a profit motive for this venture.

2. Cost of Goods Sold

Section 61(a) defines gross income as "all income from whatever source derived". In determining gross income, however, taxpayers may offset gross receipts by the cost of goods sold. Sec. 1.61-3(a), Income Tax Regs. Taxpayers must maintain adequate books and records of their income and other items in order to substantiate amounts claimed. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

Petitioner entered into contracts with both Chicago Title and Nabisco to sell each company one-third of the season tickets. Petitioner was thus left to sell the remaining one-third, 27 games, himself. Petitioner testified that he did not use the luxury box on nights when he was unable to lease it out because he had his own personal tickets in addition to the luxury box.

Petitioner, however, did not provide any evidence concerning these alternate tickets, and we find his testimony unconvincing. Petitioner has provided a number of documents in support of his claim for cost of goods sold, including an invoice from the Houston Astros baseball club showing a cost of $27,316.67 and a total amount (due after credits of $3,475 from prior year's playoff tickets) of $23,841.67[5] (for an average cost of $883 per game), a copy of a check, signed by petitioner payable to the Houston Astros for $8,841.67, and what purports to be a receipt showing a cash payment of the $15,000 difference.

Petitioner has also provided catering invoices issued to him by the Houston Astros that list the food items consumed in the luxury box and its associated costs. These catering invoices include information on the companies using the luxury box that night and indicate that Frexie, Kodiak, and Chicago Title all used the luxury box at some point during the 2002 baseball season.

Petitioner conceded that some of the food costs claimed on MTEM's Schedule C should have been claimed on the MCS Schedule C. We will address these costs below.

---

[5]If a season ticket holder purchases playoff tickets but the team does not advance to the playoffs, the cost of the unused playoff tickets is often credited towards the purchaser's next season ticket purchase.

Petitioner did not testify to or provide any documents to support the $3,475 credit and it is unclear whether he claimed a cost of goods sold including that credited amount in the prior year. In addition, petitioner testified that on three occasions he used the luxury box for MCS business meetings, leaving 24 games petitioner sold or attempted to sell as part of the business of MTEM. Petitioner testified that he was able to sell tickets to about 15 of the remaining 24 games. However, petitioner has failed to establish a business purpose for the use of the luxury box on the remaining dates or provide any evidence to substantiate that the luxury box on the remaining dates was not used for personal purposes. Accordingly, petitioner is entitled to claim a cost of goods sold in the amount of $13,245 or $883 per game for the 15 games he was able to sell.

### 3. Food and Entertainment

On petitioner's Schedule C for MTEM, he claimed a deduction of $1,272 for food and entertainment. Respondent disallowed this deduction in its entirety. At trial, petitioner testified that some portion of this cost should have been included on the Schedule C for MCS because the food and entertainment was consumed during a MCS meeting. As stated above, meetings relating to MCS were held at the luxury box that formed the basis for MTEM. Petitioner's witness also credibly testified that meetings related to MCS were held at petitioner's luxury box and

that the witness had in fact attended those meetings.  Petitioner and his witness both credibly testified that the parties to the attempted Coleman transaction met one to two times at petitioner's luxury box at Minute Maid Field.  Petitioner's witness also testified that the parties to the deal spent most of their time at the luxury box discussing the proposed deal and trying to finalize it.

Petitioner must meet the substantiation requirements of section 274(d) before he can deduct the cost of meals and entertainment on the Schedule C for MCS.  Section 1.274-2(c)(7), Income Tax Regs., provides that expenditures for entertainment, even if connected with a taxpayer's trade or business, will generally be considered not directly related to the active conduct of the taxpayer's trade or business if the entertainment occurred under circumstances where there was little or no possibility of engaging in the active conduct of trade or business.  A meeting or discussion at a sporting event is generally considered a circumstance where there is little or no possibility of engaging in the active conduct or a trade or business.  See sec. 1.274-2(c)(7)(ii)(a), Income Tax Regs. However, section 1.274-2(d)(1)(i), Income Tax Regs., provides that any expenditure for entertainment which is not directly related to the active conduct of the taxpayer's trade or business will not be allowable as a deduction unless it was associated

with the active conduct of a trade or business as defined in section 1.274-2(d)(2), Income Tax Regs. An expenditure for entertainment shall be considered associated with the active conduct of a taxpayer's trade or business if the taxpayer establishes that he had a clear business purpose in making the expenditure, such as to obtain new business or to encourage the continuation of an existing business relationship. Sec. 1.274-2(d)(2), Income Tax Regs.

Petitioner, in support of this deduction, submitted four invoices for catering at Minute Maid Park. Each invoice included the suite number, the customer name, the company, the date and time, an itemized list of the food served, and its total cost.

The first invoice is dated March 29, 2002, and lists Chicago Title as the company. The total cost was $948.44. Petitioner has not provided any evidence to support that he paid this amount nor has he testified or provided any evidence relating to the business purpose of this expense, or his relationship to the other parties involved, as required by section 274(d). Petitioner also did not argue that the exception provided in section 274(e)(8) applies. Petitioner is not entitled to this deduction for $948.44.

The second invoice is dated July 26, 2002, and lists petitioner as the contact and Frexie as the company. The total cost was $322.61. Petitioner failed to provide any evidence

concerning the business purpose of this expense or the relationship to other parties involved. Petitioner is not entitled to this deduction.

The third invoice is dated August 23, 2002, and lists Kodiak as the company, with a total cost of $577.49. The fourth invoice is dated August 30, 2002, and lists Kodiak as the company, with a total cost of $423.93.

Petitioner and his witness both credibly testified that meetings related to Kodiak were held at petitioner's luxury box to discuss potential business deals on behalf of MCS. Petitioner and his witness both credibly testified as to the business purpose of these two meetings and the invoices provided by petitioner indicate the date, time, and amount of the cost incurred. Petitioner and his witness also testified that meetings were held at the luxury box because it was the only available location to get all of the interested parties together. Petitioner's and his witness's testimony taken together show that petitioner had a clear business purpose in making these expenditures. Accordingly, petitioner has satisfied his burden under section 1.274-2(d)(2), Income Tax Regs., and is entitled to a deduction for these costs as associated entertainment expenses. Because petitioner does not fit within any of the exceptions contained in section 274(n)(2), his deduction will be limited to 50 percent of the allowable amount. Sec. 274(n)(1).

Petitioner has met his burden under section 274(d) only as to the third and fourth invoices, and he has provided sufficient evidence of the business purpose of the meetings.  Accordingly, petitioner is entitled only to a deduction of $1,001 for food and entertainment.

Casualty Loss

Section 165(a) allows a taxpayer a deduction for losses sustained during the taxable year and not compensated for by insurance or otherwise.  Section 165(h)(1) provides that any loss of an individual described in section 165(c)(3) is allowed only to the extent that the amount of the loss arising from each casualty exceeds $100.  Section 165(h)(2) provides that if the personal casualty losses for a taxable year exceed the personal casualty gains for the year, the losses are allowable only to the extent of the sum of the personal casualty gains for that taxable year, plus so much of the excess as exceeds 10 percent of adjusted gross income for that taxable year.  Thus, where there are no personal casualty gains for a taxable year, personal casualty losses (in excess of $100 per casualty) are allowable to the extent that they exceed 10 percent of adjusted gross income for that taxable year.

In the case of an item held for personal use, the amount deductible is governed by section 1.165-7(b)(1), Income Tax Regs., which provides that the amount of the loss to be taken

into account for purposes of section 165(a) shall be the lesser of: (1) The amount which is equal to the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty, or (2) the amount of the adjusted basis for determining the loss from the sale or other disposition of the property involved. For individuals, section 165(c)(3) allows a taxpayer to deduct a loss from theft.

Petitioner claimed the following casualty loss deductions:

| Item | Amount |
|------|--------|
| Damage to automobile | $1,192 |
| Damage to fence | 1,728 |
| Lithograph 1 | 1,500 |
| Lithograph 2 | 1,100 |
| Total | 5,520 |

1. Automobile

Petitioner claimed a casualty loss for damage to his car and certain possessions of his that were inside the automobile during a flood in Texas. Petitioner submitted two documents in support of this deduction. The first is a handwritten list of items damaged in the flood and other losses incurred, including shoes, clothes, the use of the vehicle, and ruined water, with what purports to be their values. The list also states "deductible-$500". The second was an invoice from an automobile repair shop in the amount of $9,360. At trial, petitioner conceded that he was reimbursed $9,360 by his insurance company. Pursuant to

section 165(a), petitioner is not entitled to a deduction for the amount reimbursed by his insurance company. As to the other expenses, petitioner has not met his burden of substantiation. Petitioner did not provide any evidence of the fair market values of the allegedly damaged property either before or after the damage from the flood was incurred. Nor did petitioner provide evidence of the adjusted bases of the property involved and any evidence as to whether that property was sold or otherwise disposed of. Because petitioner did not provide any of the evidence required by section 1.165-7(b)(1), Income Tax Regs., in order to substantiate his loss, petitioner is not entitled to a deduction for damage sustained by flood.

2. Fence

Petitioner claimed a casualty loss of $1,728 for damage to his fence incurred when it was hit by a car. Petitioner calculated this figure by multiplying $8.50 (the lowest estimate he received for fixing the fence) by 170 feet. Petitioner claimed that he reported the incident to the police, but failed to provide a police report. Petitioner's evidence consists of a single sheet of paper listing what he alleges to be a case number and the name of an alleged sergeant with the police force.

Section 1.165-7(a)(2)(ii), Income Tax Regs., provides that the cost of repairs to the property damaged is acceptable as evidence of the loss of value if the taxpayer shows that (a) the

repairs are necessary to restore the property to its condition immediately before the casualty, (b) the amount spent for such repairs is not excessive, (c) the repairs made are not for more than the damage suffered, and (d) the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the casualty.

Petitioner has not substantiated this loss. Petitioner has failed to provide any evidence as required by section 1.165-7(a)(2)(ii), Income Tax Regs., and is therefore not entitled to a deduction for any damage sustained by his fence.

### 3. Lithographs

Petitioner claimed on his Form 1040 casualty losses of $1,500 and $1,100 related to the loss or theft of one lithograph, and another lithograph petitioner referred to as missing. At trial, petitioner only testified and submitted evidence as to one lithograph, which he claims he ordered and paid for but never received from the seller. Petitioner testified that although the company claimed it was delivered and signed for, he never received it and that his signature was forged on the FedEx paperwork.

Theft losses claimed under section 165(a) are calculated in the same manner as provided in section 1.165-7, Income Tax Regs. See sec. 1.165-8(c), Income Tax Regs.

The only evidence petitioner provided was a handwritten letter petitioner sent to the seller and the seller's response, which included a FedEx proof of delivery sheet. Petitioner's handwritten letter claims that the lithograph was paid for by check, but petitioner did not submit the check as evidence. In his posttrial brief, however, petitioner claims to have submitted credit card statements to respondent indicating the price for the lithograph. Petitioner failed to submit these credit card invoices as evidence.

Accordingly, petitioner is not entitled to a casualty loss deduction for either lithograph because he has not provided sufficient substantiation.

Capital Loss Carryforward

As stated above, petitioner included a $3,000 capital loss carryforward on his tax return, but later decided that he did not wish to claim it. This was indicated by the inclusion of a handwritten footnote on the front page of his Form 1040. At trial, he reserved the right to claim this loss if we were to agree with respondent's determinations and increase his income accordingly.

Generally, losses generated by the sale or exchange of capital assets are allowed only to the extent allowed in sections 1211 and 1212. Sec. 165(f). Section 1211(b) requires a noncorporate taxpayer to first offset capital losses against

capital gains. If aggregate capital losses exceed aggregate capital gains, up to $3,000 of the excess may be deducted against ordinary income. Id. If a noncorporate taxpayer has capital losses exceeding the limitations of section 1211(b), the unused losses may only be carried forward to subsequent tax years, not back. See sec. 1212(b).

Petitioner did not produce any evidence at trial substantiating this capital loss carryforward and failed to provide returns for any other year showing that he incurred a loss which could be carried forward to the 2002 tax year. Therefore, petitioner is not entitled to the $3,000 capital loss carryforward deduction.

Employment Tax

Respondent also argues that petitioner is liable for self-employment tax. Section 1401 imposes a percentage tax on self-employment income of every individual. See Baker v. Commissioner, T.C. Memo. 2001-283. Self-employment income is defined as "the net earnings from self-employment derived by an individual * * * during any taxable year". Sec. 1402(b). The term "net earnings from self-employment" is defined as "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions * * * which are attributable to such trade or business". Sec. 1402(a).

Respondent determined self-employment taxes on the basis of

petitioner's income from his Schedule C businesses. Petitioner is also entitled, if subject to self-employment tax, to a deduction for one-half of the amount of self-employment tax imposed. If in a Rule 155 calculation petitioner has income of $400 or more from either business, he will be liable for self-employment tax.

Section 6662 Penalty

We next consider whether petitioner is liable for accuracy-related penalties pursuant to section 6662(a). Pursuant to section 6662(a) and (b), a taxpayer may be liable for a penalty of 20 percent of the portion of an underpayment of tax due to negligence or disregard of rules or regulations. The term "negligence" in section 6662(b)(1) includes any failure to make a reasonable attempt to comply with the Internal Revenue Code; this may include a failure to keep adequate books and records or to substantiate items properly. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. Negligence has also been defined as the failure to exercise due care or the failure to do what a reasonable person would do under the circumstances. See Allen v. Commissioner, 92 T.C. 1, 12 (1989), affd. 925 F.2d 348, 353 (9th Cir. 1991); Neely v. Commissioner, 85 T.C. 934, 947 (1985). The term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c).

The Commissioner has the burden of production with respect

to accuracy-related penalties. Sec. 7491(c). To meet that burden, the Commissioner must produce sufficient evidence indicating that it is appropriate to impose the penalty. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Once the Commissioner meets his burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect. Rule 142(a); see Higbee v. Commissioner, supra at 446-447. The taxpayer may meet this burden by proving that he or she acted with reasonable cause and in good faith. See sec. 6664(c)(1); sec. 1.6664-4(a), Income Tax Regs.

Respondent determined a $1,447.80 accuracy-related penalty under section 6662(a) for taxable year 2002. Respondent determined that petitioner's 2002 underpayment of tax was attributable to negligence or disregard of rules and regulations.

Petitioner testified credibly as to the profit motive behind his attempted ventures and has convinced the Court that he was a legitimate businessman. However, petitioner's records were insufficient to substantiate the majority of his claimed deductions, and petitioner failed to keep adequate books and records. Therefore respondent has met the burden of production with respect to the penalty for negligence, and petitioner, having failed to show reasonable cause or other basis for

reducing the underpayment on which the penalty is imposed, is liable for the section 6662(a) penalty for 2002.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.